MINNEHAHA CREEK WATERSHED DISTRICT, a political subdivision of the State of Minnesota, Lake Minnetonka Conservation District, a public corporation and political subdivision of the State of Minnesota, Lake Minnetonka Association, a Minnesota non-profit Corporation, Thomas P. Lowe, and William Bradley VanNest, Plaintiffs,

and

The State of Minnesota, Department of Natural Resources, Plaintiff in Intervention,

v.

Martin R. HOFFMAN, Individually and as Secretary, Department of the Army, Corps of Engineers, Department of the Army, Lieutenant General William C. Gribble, Individually and as Chief of Engineers, Department of the Army, and Colonel Forrest T. Gay, Individually and as District Engineer, Corps of Engineers, Department of the Army, Defendants.

No. 3–76 Civ. 149.

United States District Court,
D. Minnesota,
Third Division.

April 19, 1978.

Raymond A. Haik, Popham, Haik, Schnobrich, Kaufman & Doty, Minneapolis, Minn., for plaintiff Minnehaha Creek Watershed Dist.

Glenn E. Purdue, LeFevere, Lefler, Pearson, O'Brien & Drawz, Minneapolis, Minn., for plaintiff Lake Minnetonka Conservation Dist.

Richard A. Hassel and Dobson West, Wright, West & Diessner, Minneapolis, Minn., for plaintiffs Lake Minnetonka Ass'n, Thomas P. Lowe and William Bradley VanNest.

Warren Spannaus, Atty. Gen., State of Minnesota, by Steven G. Thorne, Sp. Asst. Atty. Gen., St. Paul, Minn., for plaintiff in intervention.

Andrew W. Danielson, U. S. Atty., by Stephen G. Palmer, Asst. U. S. Atty., Minneapolis, Minn., and Donald W. Fowler, Dept. of Justice, Washington, D. C., for defendants.

## FINDINGS OF FACT AND MEMORANDUM ORDER

DONALD D. ALSOP, District Judge.

This case comes before the court on cross-motions for summary judgment based upon the pleadings and affidavits on file herein. It appearing to the court that no material issues of fact are in dispute, the case is ripe for a determination upon its merits.

This is an action for declaratory judgment and injunctive relief with respect to the regulatory jurisdiction asserted by the United States Department of the Army over the body of water known as Lake Minnetonka in Hennepin County, Minnesota, and its outlet, Minnehaha Creek.

The plaintiffs seek a declaratory judgment determining that Lake Minnetonka

and Minnehaha Creek are not navigable waters of the United States within the meaning of Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403. They further seek a declaratory judgment determining that the regulations promulgated by the defendants pursuant to Section 404 of the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. § 1344, are invalid to the extent that they purport to regulate activities which are beyond the purview of that statute.

The plaintiff in intervention also seeks a declaratory judgment that, to the extent the court finds defendants do have jurisdiction over Lake Minnetonka, General Permits AM–10 and AM–11, issued by defendant Gay on April 23, 1976, are invalid insofar as they conflict with state and local regulations and insofar as they require the submission of applications for permission to conduct certain activities on the lake.

The plaintiffs are two political subdivisions of the State of Minnesota with planning and regulatory authority over the waters in question, a non-profit corporation organized to preserve the qualities of Lake Minnetonka, and two private homeowners who reside on the shore of Lake Minnetonka. The State of Minnesota, Department of Natural Resources, which exercises regulatory authority over public waters in the state, appears as an intervening party plaintiff.

The defendants are individuals serving as Secretary of the Army, Chief of Engineers of the Department of the Army, and District Engineer of the St. Paul District of the Army Corps of Engineers, as well as the Army Corps of Engineers as an entity.

This court has jurisdiction under 28 U.S.C. § 1331. (See Memorandum Order filed March 4, 1977.)

Upon the pleadings and affidavits on file herein, the court makes the following findings of fact:

1. Lake Minnetonka is a natural lake entirely located in west central Hennepin County, Minnesota. It has a total surface area of 22.5 square miles. Water levels in the lake are controlled by a fixed crest dam at the eastern end of Gray's Bay. The depth of the lake averages forty feet, although in isolated spots maximum depths reach eighty to one hundred feet. No permanent tributaries empty into Lake Minnetonka; Minnehaha Creek is the lake's single outlet. (Affidavits of Frank Mixa, director of Lake Minnetonka Conservation District, and Franklin J. Ryder, chief, Regulatory Branch, St. Paul District, Corps of Engineers.)

2. Minnehaha Creek flows approximately 20–22 miles eastward from Gray's Bay and enters the Mississippi River. The flow of the creek is variable and intermittent; during a large part of the summer and fall, the flow, if any at all, is inadequate to provide sufficient depth for passage of any form of navigation. (Affidavits of Frank Mixa, director of Lake Minnetonka Conservation District, and Franklin J. Ryder, chief, Regulatory Branch, St. Paul District, Corps of Engineers.)

3. There is no history of navigation, private or commercial, on Minnehaha Creek. (Affidavit of Frank Mixa, director of Lake Minnetonka Conservation District.)

4. Lake Minnetonka has a history of use in navigation and commerce as follows:

 a. Prior to settlement of the lake in the mid-19th century, Indians navigated the lake by canoe.

 b. In 1852, a dam and sawmill constructed at Minnetonka Mills on Minnehaha Creek raised the lake level sufficiently to float steam-powered boats and logs.

 c. During and after the Civil War and until 1926, luxury steamboats were operated on the lake.

 d. From and after 1867, steamers carried passengers from the newly constructed railroad (which ran to St. Paul) at Wayzata across the lake to Excelsior.

 e. From and after 1867, steamers carried mail from Excelsior across Lake Minnetonka and down Minnehaha Creek to Minnetonka Mills. From there, horse-drawn stages carried the mail to Minneapolis and elsewhere.

f. Newspapers were shipped by rail from St. Paul to Wayzata and delivered from there to points around the lake by steamboat.

g. In 1869, a flour mill, and later a grain elevator, was constructed at Minnetonka Mills and was serviced by the railroad. Grain and lumber products were shipped or floated on the lake to the mills and then shipped in commerce by rail. The flour was marketed internationally.

h. Timber logged along the shores of Lake Minnetonka was floated across the lake to Wayzata and carried by trains to be used as fuel for the locomotives.

i. Beginning in 1890 and continuing thereafter, Lake Minnetonka, a thriving resort area, was used by American and foreign tourists as a means of transportation to reach points around the lake and for recreational purposes.

(Affidavit of Franklin J. Ryder, chief, Regional Branch, St. Paul District, Corps of Engineers.)

5. Navigation on the portion of Minnehaha Creek between Lake Minnetonka and Minnetonka Mills was rendered impossible in 1897 by the construction of a dam at the outlet of the creek at Gray's Bay. (Affidavit of Franklin J. Ryder, chief, Regional Branch, St. Paul District, Corps of Engineers.)

6. Centers of urban population around the lake are located at Mound, Excelsior, and Wayzata. Rail service to shoreline communities is provided by the Burlington Northern and by the Chicago and Northwestern Railroad. (Affidavit of Franklin J. Ryder, chief, Regional Branch, St. Paul District, Corps of Engineers.)

7. On May 12, 1916, the District Engineer for the St. Paul District of the Corps of Engineers advised the Minneapolis Street Railway Company that construction of a bridge across an arm of Lake Minnetonka would require the approval of the Chief of Engineers. With that exception, the Corps of Engineers has not exercised active jurisdiction over Lake Minnetonka or Minnehaha Creek until February of 1975. (Affidavit of Franklin J. Ryder, chief, Regional Branch, St. Paul District, Corps of Engineers.)

8. In June of 1945, the Minnesota Attorney General advised that Minnehaha Creek was a navigable water of the State and would be treated as such by state administrative agencies. The state of Minnesota has continued to treat Lake Minnetonka and Minnehaha Creek as navigable for the purposes of its laws and regulations. (Affidavit of Franklin J. Ryder, chief, Regional Branch, St. Paul District, Corps of Engineers.)

9. In 1976, approximately 10,000 small pleasure boats were docked on the lake or used on the lake at various times. (Affidavit of Frank Mixa, director of Lake Minnetonka Conservation District.)

10. At present, navigation on Lake Minnetonka is limited to powerboats and recreational craft. Several marinas rent boats for use on the lake, and three charter excursion boats carry large numbers of passengers for hire. Several noncommercial seaplanes use the lake. The present use is primarily recreational. In addition to local residents, travelers from other states use the lake for these purposes. (Affidavit of Thomas A. Larson, Assistant District Counsel, St. Paul District, Corps of Engineers.)

11. Lake Minnetonka is currently regulated by several levels of state and local government. The principal regulatory body is the Lake Minnetonka Conservation District (LMCD), created by the state legislature in 1967 as a public corporation and political subdivision of the state of Minnesota. The LMCD is charged by statute with broad responsibilities of regulating the use of the lake, undertaking research regarding the lake, and eliminating pollution in the lake. The LMCD has statutory authority to regulate the construction, installation and maintenance of permanent docks and moorings and the construction, size, location, and configuration of marinas and their related facilities. Pursuant to this authority, the LMCD has enacted and does enforce ordinances regulating structures within the lake. (Affidavit of Frank Mixa, director of Lake Minnetonka Conservation District.)

12. The regulations promulgated by the Corps of Engineers represent a duplication of regulatory programs already in existence and being carried out by the Minnesota Department of Natural Resources, the Minnehaha Creek Watershed District, the Lake Minnetonka Conservation District, and thirteen municipalities that adjoin Lake Minnetonka. If the Corps' regulations take effect, the Department of Natural Resources will be required to expend significant efforts at a cost of approximately $3,000 to coordinate existing programs with federal agencies. (Affidavit of Ronald D. Harnack, Regional Hydrologist, DNR).

13. In September of 1973, the LMCD and six local governmental bodies entered into a cooperative agreement relating to the improvement of Minnehaha Creek and including the construction of a new headwaters control structure. A public hearing was held, and the Minnesota Environmental Quality Council waived any environmental impact statement. Application was made to the Corps of Engineers on April 27, 1976 for a permit to proceed with the project. The Corps held a public hearing on August 11, 1976, but, as of September 16, 1976, had not announced any decision relating to the project. (Affidavit of Lawrence E. Kelley, president of the Minnehaha Creek Watershed District Board of Managers.)

14. The city of Deephaven, a member of the LMCD, applied to the Minnehaha Creek Watershed District, the Minnesota Department of Natural Resources, and the Corps of Engineers in January and February of 1976 for permits to do minor shoreline maintenance work in Lake Minnetonka. Permits were issued by the state agencies in March and June of 1976. As of September 29, 1976, the only reason the project could not proceed was that the Corps had not granted a permit. (Affidavit of Frank Mixa, director of Lake Minnetonka Conservation District.)

15. On February 14, 1975, on the basis of a report and recommendation prepared by the St. Paul District of the Corps of Engineers and entitled "Navigable Status of Lake Minnetonka and Minnehaha Creek, Hennepin County, Minnesota," the Chief of Engineers of the Corps, through a document entitled "Determination of Navigability—Lake Minnetonka/Minnehaha Creek, Minnesota," determined that Lake Minnetonka and that portion of Minnehaha Creek upstream from Minnetonka Mills are "navigable waters of the United States for purposes of the exercise of regulatory jurisdiction by the Corps of Engineers." (Plaintiff's Complaint, Exhibit C.)

16. Three types of activities have been affected by the Corps' attempt to exercise jurisdiction: the construction of minor dock-like structures in Lake Minnetonka, the placement of rip-rap shoreline protection in the lake, and the construction of a new headwaters control dam on Minnehaha Creek. (Memorandum in support of Plaintiffs' Motion for Summary Judgment and Memorandum in Support of Defendant's Motion for Summary Judgment.)

Upon the foregoing findings of fact, the court makes the following memorandum of conclusions of law:

▮ The rationale given by the Corps of Engineers for its determination of navigability is not binding upon this court. The judiciary must make a *de novo* determination of the status of these waters with respect to whether they come within the regulatory jurisdiction of the Corps of Engineers. (*See* 33 C.F.R. § 329.3.) The court will examine the potential basis for the exercise of regulatory jurisdiction under the Rivers and Harbors Act of 1899 (RHA) and the Federal Water Pollution Control Act Amendments of 1972 (FWPCA) individually.

A. Rivers and Harbors Act of 1899

Section 10 of the RHA, 33 U.S.C. § 403, prohibits the creation of any obstruction to "the navigable capacity of any of the waters of the United States" unless affirmatively authorized by Congress. It thus extends regulatory jurisdiction of the federal government to navigable waters of the United States.

The issue facing the court in this case is whether Lake Minnetonka and that portion of Minnehaha Creek above Minnetonka Mills are navigable waters of the United States and thus subject to federal regulatory jurisdiction under the RHA.

Prior to the enactment of the RHA in 1899, the United States Supreme Court established the standard for determining which waterways are subject to federal regulation in the case of *The Steamer Daniel Ball v. United States,* 77 U.S. (10 Wall.) 557, 19 L.Ed. 999 (1870).

> Those rivers must be regarded as public navigable rivers which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. And they constitute navigable waters of the United States within the meaning of the Acts of Congress, in contradistinction from the navigable waters of the States, when they form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water.

*Id.* at 563, 19 L.Ed. 999.

Since the enactment of the RHA in 1899, its applicability to "navigable waters of the United States" has been construed in accordance with the standard set forth in *The Daniel Ball, supra.* The test of navigability has been judicially expanded by the Supreme Court in the case of *Economy Light and Power Co. v. United States,* 256 U.S. 113, 41 S.Ct. 409, 65 L.Ed. 847 (1921). In *Economy Light, supra,* the test for navigability is stated as:

> . . . whether the river, in its natural state, is used, or capable of being used as a highway for commerce, over which trade and travel is or may be conducted in the customary modes of trade and travel on water. Navigability, in the

sense of the law, is not destroyed because the water course is interrupted by occasional natural obstructions or portages; nor need the navigation be open at all seasons of the year, or at all stages of the water.

*Id.* at 121–22, 41 S.Ct. at 412.

The Court held that a river which had not been used for commercial purposes for 100 years was subject to federal regulatory jurisdiction since

> . . . a river having actual navigable capacity in its natural state and capable of carrying commerce among the States, is within the power of Congress to preserve for purposes of future transportation, even though it be not at present used for such commerce, and be incapable of such use according to present methods, either by reason of changed conditions or because of artificial obstructions.

*Id.* at 123, 41 S.Ct. at 413.

Thus, a waterbody which was once navigable in its natural or improved state is navigable in law even though it is not presently used, or is incapable of use, for commerce.

The navigability test was again expanded by the Supreme Court to include waterways which, although traditionally considered nonnavigable, might be made navigable with reasonable improvements. In *United States v. Appalachian Electric Power Co.,* 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 (1940), the Court stated that in determining navigability it is necessary to consider the feasibility of interstate use of the waterway after any reasonable improvements which might be made upon it. The Court further noted that once it has been found to be navigable, a waterway remains so.

In the *Appalachian Electric* case, the subject waterway was a river which flowed through the states of Virginia and West Virginia. In both the *Ball* and *Economy Light* cases, the waterway which was the subject of the litigation formed a link with other bodies of water resulting in a continuous interstate water channel. In the instant case, Lake Minnetonka is located entirely within the state of Minnesota. Its

only outlet is Minnehaha Creek, the lower stretches of which have never been and are not now susceptible to interstate commercial use. The federal government makes no attempt to base its argument that Lake Minnetonka and Minnehaha Creek are subject to its regulatory jurisdiction on any contention that they are part of a continuous interstate water channel. Rather, the government relies upon the interstate commercial links of Lake Minnetonka and Minnehaha Creek through railroad and other forms of commercial transportation.

As recently as 1971, in *Utah v. United States,* 403 U.S. 9, 91 S.Ct. 1775, 29 L.Ed.2d 279 (1971), the Supreme Court applied the *Ball* test of navigability to determine whether the Great Salt Lake was a navigable water and thus subject to the regulatory jurisdiction of the state of Utah. It is also interesting to note that although the Supreme Court determined that the Great Salt Lake was navigable and although there was evidence presented that in years past salt boats had carried salt across the lake to a railroad connection, presumably for shipment in interstate commerce, asserted federal jurisdiction over the lake was subsequently denied by the Tenth Circuit in *Hardy Salt Company v. Southern Pacific Transportation Co.,* 501 F.2d 1156 (10th Cir. 1974), *cert. denied,* 419 U.S. 1033, 95 S.Ct. 515, 42 L.Ed.2d 308 (1974), discussed *infra.*

█ Both Lake Minnetonka and that portion of Minnehaha Creek above Minnetonka Mills are navigable waters. Their historic and current uses as set forth in the findings of fact evidence their capability of use for navigation. The issue which must be decided is whether they are navigable waters of the United States. As stated in *United States v. Underwood,* 344 F.Supp. 486, 490–91 (M.D.Fla.1972), for purposes of federal law, the navigability of the waterway must be related to interstate commerce.

█ The district court in *Underwood, supra,* explained that a present lack of commercial traffic on the water is not a bar to a conclusion of navigability where the personal or private use of the water by boats demonstrates the availability of the water

for simpler types of commercial navigation. The court stated that although access to the open sea was not required, direct access or access through other bodies of water does influence a court's determination. A body of water which does support some small commercial traffic but has no nexus with interstate or foreign commerce and no access to a larger body of water may not be considered navigable. A link to interstate commerce may be found where a commercial tourist operation depends on the waterbody as its attraction to interstate travelers and injury to the waterbody might adversely affect that commerce.

In the case of *Johnson v. Wurthman,* 227 F.Supp. 135 (D.Or.1964), the court held that "small bodies of water, wholly in one state and not navigable in interstate or foreign water commerce, are not included in any common sense definition of 'navigable waters of the United States.'" *Id.* at 138.

█ In 1972, the Corps of Engineers set forth its administrative definition of navigable waters of the United States. The general definition adopted was:

> Navigable waters of the United States are those waters which are presently, or have been in the past, or may be in the future susceptible for use for purposes of interstate or foreign commerce.
> 33 C.F.R. § 209.260(c).

This definition was revised in 1977, and the Corps issued the following new general definition:

> Navigable waters of the United States are those waters that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce.
> 33 C.F.R. § 329.4.

Although the court is not bound by this administrative determination of the scope of the Corps' regulatory jurisdiction, it will accord the determination proper deference.

Plaintiffs' theory that only those waters which by themselves or in connection with other waters form an interstate water channel qualify as navigable waters of the

United States is supported by the following jury instruction which was approved by the Supreme Court in *Leovy v. United States,* 177 U.S. 621, 20 S.Ct. 797, 44 L.Ed. 914 (1900):

> [I]f from the water in one state you can travel by water continuously to another state, and the water is a navigable water, then it is a navigable stream of the United States.

This position was adopted by the Tenth Circuit in *Hardy Salt Company v. Southern Pacific Transportation Co.,* 501 F.2d 1156 (10th Cir. 1974), *cert. denied,* 419 U.S. 1033, 95 S.Ct. 515, 42 L.Ed.2d 308 (1974). The Court of Appeals rejected the contention that an intrastate waterbody (the Great Salt Lake) was a navigable water of the United States within the meaning of the RHA merely because it served as a link in the conduct of interstate commerce, namely as a conduit for the transportation of goods which were subsequently shipped interstate by rail. The court held that since the proof offered showed only a connection with a railhead and not with navigable interstate waters, as a matter of law the waterbody was not a navigable water of the United States.

Defendants contend that the *Hardy* case, to which the United States was not a party, reaches a wrong decision. They argue that Congress' exercise of jurisdiction under the RHA is coextensive with its commerce power. They urge the court to hold that a finding of use of the waterbody in interstate commerce is sufficient for the assertion of federal regulatory jurisdiction and that the waterbody itself need not be a part of an interstate waterway.

■ In the *Hardy* case, the Tenth Circuit refused to adopt the argument offered by defendants here. It stated that "[w]hen Congress uses words in a statute without defining them, and those words have a judicially settled meaning, it is presumed that Congress intended them to have that meaning in the statute. (Citations omitted.)" *Id.* at 1168. Since *The Daniel Ball* case preceded the enactment of the RHA and was a landmark decision, adhered to by the

Supreme Court in subsequent rulings, its interpretation of "navigable water of the United States" is presumed to be that intended by Congress to be employed under the RHA. As stated in *Hardy,* "if it (Congress) had intended the Act of 1899 to employ a broader definition, it would have manifested such an intention by clear and explicit language." *Id.*

■ This court is persuaded by the case law and the reasoning of the *Hardy* opinion that a body of water located entirely in one state and forming no navigable interstate waterway connection is not a navigable water of the United States within the meaning and scope of the Rivers and Harbors Act of 1899. It is clear that the intent and purpose of that Act was to insure free navigability of interstate commerce through federal regulation of the subject waterbodies. Congress did not intend to extend federal regulatory jurisdiction to every spot of navigable water in the country.

Plaintiffs argue, and defendants concede, that pursuant to the Water Resources Development Act of 1976 (WRDA), Section 154 of Public Laws 94–587, federal jurisdiction over Lake Minnetonka under the RHA could not be based solely on the lake's historical use, if any, in interstate commerce. In light of the court's conclusion that the RHA does not extend federal regulatory jurisdiction over Lake Minnetonka in any event, it need not address the issue of whether the WRDA would preclude regulation of the lake.

Similarly, the court need not address plaintiffs' contention that even if the defendants had regulatory jurisdiction over Lake Minnetonka and Minnehaha Creek under the RHA, the exercise of such jurisdiction is precluded by defendants' own regulations at 33 C.F.R. 329.7 (formerly, 33 C.F.R. 209.260(f)). It is the court's conclusion that no regulatory jurisdiction under the RHA exists in the absence of an interstate waterway connection.

B. Federal Water Pollution Control Act Amendments of 1972

Pursuant to Section 301 of the FWPCA, 33 U.S.C. § 1311, the discharge of any pollutant by any person into navigable waters is unlawful except as in compliance with other specified sections of the Act. One such section, Section 404, 33 U.S.C. §.1344, provides for the issuance of a permit by the Corps of Engineers for "the discharge of dredged or fill material into the navigable waters . . . ."

Plaintiffs do not dispute the jurisdictional authority of the Corps of Engineers over Lake Minnetonka and Minnehaha Creek under the FWPCA, which has been construed to have a broader application than the RHA. They do contend, however, that the placement of rip-rap and construction of dams do not constitute the discharge of a pollutant subject to regulatory jurisdiction under the FWPCA.

Defendants rely upon the administrative determination by the Corps that the placement of rip-rap and construction of dams do constitute the discharge of fill material as that has been defined by the Corps and are thus within its FWPCA regulatory jurisdiction. The defendants do not contend that piers and docks may be regulated under Section 404.

Plaintiffs argue that since the first statement of policy found in Section 101 of the FWPCA, 33 U.S.C. § 1251(a)(1), is that "[i]t is the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985," the definition of "pollutant" as used in Section 301 must be restricted to such matters as Congress would reasonably intend to eliminate by 1985.

Section 502 of the FWPCA, 33 U.S.C. § 1362(6), defines "pollutant" as "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water."

If the placement of rip-rap and construction of dams constitute the discharge of a pollutant within the meaning of Section 301, then they are unlawful unless permits are secured under Section 404. For the purposes of administering Section 404, the Corps of Engineers has adopted the following definition of "discharge of fill material":

. . . the addition of fill material into waters of the United States. The term generally includes, without limitation, the following activities: Placement of fill that is necessary to the construction of any structure in a water of the United States; the building of any structure or impoundment requiring rock, sand, dirt, or other material for its construction; site-development fills for recreational, industrial, commercial, residential, and other uses; causeways or road fills; dams and dikes; artificial islands; property protection and/or reclamation devices such as riprap, groins, seawalls, breakwaters, and revetments, beach nourishment; levees; fill for structures such as sewage treatment facilities; . . . .

33 C.F.R. § 323.2(n).

As defined by the Corps of Engineers, the discharge of fill material for which a permit is required thus includes the placement of rip-rap and construction of dams. Unless this activity constitutes the discharge of a pollutant, however, it is beyond the regulatory jurisdiction of the Corps under the FWPCA.

The origin of the FWPCA was the Refuse Act of 1899, formerly 33 U.S.C. § 407, which was adopted in the same year as the RHA and which forbade the discharge or deposit of refuse matter into the navigable water of the United States. Thus, the RHA was concerned with obstructions to navigation, and the Refuse Act was concerned with quality of the waters. Traditionally, the placement of rip-rap and construction of dams would be considered as being within the purview of the RHA and not of the Refuse Act. In fact, the term "refuse" was understood to include all foreign substances and pollutants that fouled the waters. *See*

generally *United States v. Standard Oil Co.,* 384 U.S. 224, 86 S.Ct. 1427, 16 L.Ed.2d 492 (1966).

Prior to 1975, when the Corps sought to regulate rip-rap and dams it did so under sections of the RHA which dealt specifically with those structures. The Corps now seeks to regulate those structures under the broader jurisdictional grant of the FWPCA.

 Although the definition of "pollutant" in the FWPCA (quoted above) is more expansive than that formerly of "refuse," the court is convinced that the placement of rip-rap and construction of dams are beyond the intent and purpose of the FWPCA. The regulation of discharge of rock and sand authorized by the FWPCA does not extend to all matters which incidentally require rock or sand for construction. Where no significant alteration of water quality is at issue, there is no federal interest under the FWPCA in the activity.

In this instance, the absence of federal regulation over rip-rap placement and dam construction will not leave Lake Minnetonka and Minnehaha Creek subject to unfettered dissipation and pollution. Local and state governmental bodies have been engaged in an effective and conscientious effort to upgrade the quality of these two waterbodies. To a large extent the regulatory jurisdiction asserted by the Corps is duplicative of these local regulatory efforts and would only serve to increase overlapping procedures and paperwork.

The court thus concludes that the purported regulation by the Corps of Engineers of the placement of rip-rap and construction of dams is beyond the purview of the FWPCA.

In view of its rulings with respect to the RHA and the FWPCA, the court need not address the independent issue raised by the Department of Natural Resources of the validity of General Permits AM–10 and AM–11 issued by the Corps.

Upon the foregoing,

IT IS ORDERED That plaintiffs' motion for summary judgment be and hereby is granted.

IT IS FURTHER ORDERED That the motion of the plaintiff in intervention for summary judgment be and hereby is granted in part and denied as moot in part.

IT IS FURTHER ORDERED That defendants' motion for summary judgment be and hereby is denied.

Let the Clerk enter judgment accordingly and

1. Declaring that Lake Minnetonka and that portion of Minnehaha Creek above Minnetonka Mills are not navigable waters of the United States within the meaning of the Rivers and Harbors Act of 1899;

2. Directing defendants Secretary of the Army and Chief of Engineers to withdraw the Determination of Navigability of February 14, 1975;

3. Permanently enjoining defendants Secretary of the Army, Corps of Engineers, Chief of Engineers, and District Engineer from asserting regulatory jurisdiction of the Corps of Engineers over Lake Minnetonka and that portion of Minnehaha Creek above Minnetonka Mills under the Rivers and Harbors Act of 1899;

4. Declaring the regulations promulgated by defendants pursuant to Section 404 of the Federal Water Pollution Control Act Amendments of 1972 to be invalid insofar as they purport to regulate the placement of rip-rap and the construction of dams, activities unrelated to water quality and therefore beyond the scope of that statute;

5. Permanently enjoining defendants Secretary of the Army, Corps of Engineers, Chief of Engineers, and District Engineer from asserting regulatory jurisdiction of the Corps of Engineers over the placement of rip-rap and the construction of dams in Lake Minnetonka and in that portion of Minnehaha Creek above Minnetonka Mills under the Federal Water Pollution Control Act Amendments of 1972.