597 F.2d 617
 13 ERC 1009, 9 Envtl. L. Rep. 20,334
 MINNEHAHA CREEK WATERSHED DISTRICT, a Political Subdivision
of the State of Minnesota, Lake Minnetonka Conservation
District, a Public Corporation and Political Subdivision of
the State of Minnesota, Lake Minnetonka Association, a
Minnesota Nonprofit Corporation, Thomas P. Lowe and William
Bradley VanNest, Appellees,
and
The State of Minnesota, Department of Natural Resources,
Plaintiff-Intervenor- Appellee,
v.
Martin R. HOFFMAN, Individually and as Secretary, Department
of the Army, Corps of Engineers, Department of the Army,
Lieutenant General William C. Gribble, Individually and as
Chief of Engineers, Department of the Army, and Colonel
Forrest T. Gay, Individually and as District Engineer, Corps
of Engineers, Department of the Army, Appellants.
 No. 78-1448.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Dec. 13, 1978.
Decided April 23, 1979.
 
 Maryann Walsh, Atty., Dept. of Justice, Washington, D. C., for appellants; James W. Moorman, Asst. Atty. Gen., Dirk D. Snel, Atty., Dept. of Justice, Washington, D. C., on brief.
 Raymond A. Haik, Popham, Haik, Schnobrich, Kaufman & Doty, Ltd., Minneapolis, Minn., for Minnehaha Creek Watershed Dist., State of Minnesota Dept. of Natural Resources; Larry D. Espel, Popham, Haik, Schnobrich, Kaufman & Doty, Ltd., Minneapolis, Minn., and Warren Spannaus, Atty. Gen., Philip J. Olfelt, Asst. Atty. Gen., St. Paul, Minn., on brief.
 Philip J. Olfelt, Asst. Atty. Gen., St. Paul, Minn., for State of Minnesota.
 Charles L. LeFevere, LeFevere, Lefler, Pearson, O'Brien & Drawz, Minneapolis, Minn., for appellee, Lake Minnetonka Conservation Dist.; Glenn E. Purdue, Minneapolis, Minn., on brief.
 Allen I. Olson, Atty. Gen., and Murray G. Sagsveen, Asst. Atty. Gen., State of N. D., Bismarck, N. D., filed brief amicus curiae.
 Before HEANEY and McMILLIAN, Circuit Judges, and TALBOT SMITH, Senior District Judge.*
 HEANEY, Circuit Judge.
 
 
 1
 The United States Army Corps of Engineers and various officials of the Corps appeal from the judgment of the District Court which permanently enjoined the Corps from asserting regulatory jurisdiction over the waters of Lake Minnetonka in Hennepin County, Minnesota, under § 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403. Minnehaha Cr. Watershed Dist. v. Hoffman, 449 F.Supp. 876 (D.Minn.1978). The District Court also permanently enjoined the Corps from asserting regulatory jurisdiction over the placement of riprap and the construction of dams in Lake Minnetonka under the Federal Water Pollution Control Act (F.W.P.C.A.), 33 U.S.C. § 1251 Et seq.[1] Id. We affirm in part and reverse in part.
 
 
 2
 The facts in this case are not in dispute, and we essentially adopt the findings of fact as set forth in the District Court's opinion. Id. at 879-881.
 
 
 3
 Lake Minnetonka is a natural lake, navigable in fact, lying entirely within Hennepin County, Minnesota. The total surface area of the lake is approximately 22.5 square miles. The lake's depth averages forty feet, although there are isolated spots with depths up to one hundred feet. No permanent tributaries empty into Lake Minnetonka. The lake's single outlet is Minnehaha Creek, which flows eastward from Gray's Bay for approximately 20-22 miles, until it empties into the Mississippi River.
 
 
 4
 Prior to settlement of the area surrounding the lake in the mid-19th century, Indians navigated the lake by canoe. In 1852, a dam and sawmill were constructed on Minnehaha Creek at Minnetonka Mills, a short distance from where Lake Minnetonka flows into Minnehaha Creek. After the construction of this dam, the lake's water level increased sufficiently to allow the navigation of steam-powered boats and the flotation of logs on the lake. Steamers were used for the carriage of passengers and mail across the lake until 1926. Grain and lumber were shipped or floated on the lake to distribution points, where they were then shipped by rail. Beginning in 1890 and continuing thereafter, Lake Minnetonka was a thriving resort area, with North American and foreign tourists using the lake as a means of transportation from one shore point to another.
 
 
 5
 Present use of Lake Minnetonka is primarily recreational, by both local residents and travelers from other states. Centers of urban population around the lake include the towns of Mound, Excelsior and Wayzata. Rail service to shoreline communities is provided by the Burlington Northern and the Chicago and Northwestern Railroads.
 
 
 6
 The flow of Minnehaha Creek, is intermittent; during a large part of the summer and fall, the flow is inadequate to permit the passage of any form of navigation. There is no history of navigation on the creek of either a private or a commercial nature. Navigation on that portion of the creek between Lake Minnetonka and Minnetonka Mills was rendered impossible by the construction of a dam at the source of the creek at Gray's Bay in 1897.
 
 
 7
 On May 16, 1916, the Army Corps of Engineers advised the Minneapolis Street Railway Company that construction of a bridge across an arm of Lake Minnetonka would require the Corps' approval. The Corps did not exercise active jurisdiction over the lake again until February 14, 1975, when it issued a "Determination of Navigability" which concluded that Lake Minnetonka and that portion of Minnehaha Creek above Minnetonka Mills are "navigable waters of the United States," and are, thus, subject to Corps' jurisdiction under the Rivers and Harbors Act. The Corps has since asserted its regulatory authority over the lake under both the Rivers and Harbors Act and under § 404 of the F.W.P.C.A.
 
 
 8
 The appellees[2] brought this action, seeking a declaratory judgment that Lake Minnetonka and Minnehaha Creek above Minnetonka Mills are not "navigable waters of the United States" within the meaning of the Rivers and Harbors Act. The appellees requested the entry of an order directing the Corps to withdraw the "Determination of Navigability" of February 14, 1975, and permanently enjoining the Corps from exercising regulatory jurisdiction over Lake Minnetonka or Minnehaha Creek under the Rivers and Harbors Act. The appellees also sought a declaratory judgment that 33 C.F.R. § 323.2(n), promulgated by the Corps, is invalid insofar as it attempts to extend the Corps' permitting program under § 404 of the F.W.P.C.A. over the placement of riprap and the construction of dams in navigable waters. They sought a permanent injunction against the Corps' assertion of regulatory jurisdiction pursuant to this regulation over the placement of riprap and the construction of dams in Lake Minnetonka and Minnehaha Creek.
 
 
 9
 Upon cross-motions for summary judgment, the District Court held for the appellees on both counts and granted all the relief requested. Applying the test set forth in The Daniel Ball v. United States, 77 U.S. (10 Wall.) 557, 19 L.Ed. 999 (1871), the court held that although both Lake Minnetonka and Minnehaha Creek above Minnetonka Mills are navigable waters, since their capability of use for navigation is undisputed, they are not "navigable waters of the United States" as that phrase is used in the Rivers and Harbors Act because they are located entirely within one state and have no interstate waterway connection with other navigable waters. Minnehaha Cr. Watershed Dist. v. Hoffman, supra at 884. The court held that the Corps lacked jurisdiction over the placement of riprap and the construction of dams in the lake and in the creek since, in its view, such activities do not constitute the "discharge of (a) pollutant" under § 301 of the F.W.P.C.A., 33 U.S.C. § 1311. The court reasoned that although "pollutant," as defined in § 502(6) of the F.W.P.C.A., 33 U.S.C. § 1362(6), includes "rock, sand, (and) cellar dirt," and riprap and dams incidentally require rock or sand for construction, such activities are not within the purview of the Act because they do not significantly alter water quality. Id. at 886. We will consider these holdings Seriatim.
 
 
 10
 A. Jurisdiction of the Corps of Engineers Under the Rivers
 
 
 11
 and Harbors Act of 1899.
 
 
 12
 In The Daniel Ball v. United States, supra, the United States Supreme Court set forth what was to become the foundational test for determining federal regulatory power over the coastal or inland waters of the United States. Waters subject to federal regulatory jurisdiction, or "navigable waters of the United States," were defined by the Court as follows:
 
 
 13
 Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. And they constitute navigable waters of the United States within the meaning of the Acts of Congress, in contradistinction from the navigable waters of the States, when the form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water.
 
 
 14
 Id., 77 U.S. (10 Wall.) at 563.
 
 
 15
 Although The Daniel Ball was a case brought in admiralty,[3] the Court did not base its decision on federal maritime or admiralty jurisdiction but rather on federal power over coastal and inland waterways under the Commerce Clause. The Court stated that since the river in question flowed into Lake Michigan, an interstate waterway, a public navigable waterway is formed which is "brought under the direct control of Congress in the exercise of its commercial power." Id., 77 U.S. (10 Wall.) at 564. The Court cited its prior statement in Gilman v. Philadelphia, 70 U.S. (3 Wall.) 713, 18 L.Ed. 96 (1866), that " '(t)he (federal) power to regulate commerce comprehends the control * * * of all the navigable waters of the United States which are accessible from a state other than those in which they lie. For this purpose they are the public property of the nation, and subject to all the requisite legislation by Congress' ". The Daniel Ball v. United States, supra, 77 U.S. (10 Wall.) at 564, quoting Gilman v. Philadelphia, supra, 70 U.S. (3 Wall.) at 724-725. Although it has since been established that federal admiralty and maritime jurisdiction and federal power under the Commerce Clause are not necessarily coextensive, See Panama Railroad Co. v. Johnson, 264 U.S. 375, 44 S.Ct. 391, 68 L.Ed. 748 (1924); Ex parte Garnett, 141 U.S. 1, 12, 11 S.Ct. 840, 35 L.Ed. 631 (1891), the test for federal jurisdiction over navigable waters which was set out in The Daniel Ball has been consistently applied by the Supreme Court in cases involving federal power under the Commerce Clause. See, e. g., Leovy v. United States, 177 U.S. 621, 20 S.Ct. 797, 44 L.Ed. 914 (1900); Miller v. Mayor, Etc. of New York, 109 U.S. 385, 3 S.Ct. 228, 27 L.Ed. 971 (1883); Escanaba, Etc., Trans. Co. v. Chicago, 107 U.S. 678, 2 S.Ct. 185, 27 L.Ed. 442 (1883).
 
 
 16
 Since the Rivers and Harbors Act of 1899 was an exercise by Congress of its power under the Commerce Clause, See Wyandotte Trans. Co. v. United States, 389 U.S. 191, 201, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967); United States v. Appalachian Electric Power Co., 311 U.S. 377, 404-405, 61 S.Ct. 291, 85 L.Ed. 243 (1940), we agree with the District Court that the extent of federal regulatory jurisdiction under the Act is to be determined in accordance with the basic test set forth in The Daniel Ball. The Rivers and Harbors Act of 1899 was a recompilation of two earlier acts, the Rivers and Harbors Act of 1890 and the Rivers and Harbors Act of 1894. Legislative history of the Rivers and Harbors Act of 1899 indicates that it was understood by its drafters to be merely a restatement of existing law. See United States v. Pennsylvania Chem. Corp., 411 U.S. 655, 666, 93 S.Ct. 1804, 36 L.Ed.2d 567 (1973). The extent of federal regulatory power under § 10 of the Act, under which the Corps claims jurisdiction in the instant case, is limited to "navigable * * * waters of the United States.[4] Since this is the precise phrase which was defined by the Supreme Court in The Daniel Ball, and which was used in that case and others to describe the reach of the federal commerce power over navigable waters prior to the enactment of the first Rivers and Harbors Act in 1890,[5] we must assume that Congress intended the phrase to have the meaning which it had acquired in contemporary judicial interpretation. See Case v. Los Angeles Lumber Products Co., 308 U.S. 106, 115, 60 S.Ct. 1, 84 L.Ed. 110 (1939); Hardy Salt Company v. Southern Pacific Trans. Co., 501 F.2d 1156, 1168 (10th Cir.), Cert. denied, 419 U.S. 1033, 95 S.Ct. 515, 42 L.Ed.2d 308 (1974). Indeed, virtually all courts which have interpreted the various provisions of the Rivers and Harbors Act of 1899 have begun with the basic definition of "navigable waters of the United States" set forth in The Daniel Ball. See United States v. Appalachian Electric Power Co., supra, 311 U.S. at 406, 61 S.Ct. 291; Leovy v. United States, supra; State Water Control Bd. v. Hoffman, 574 F.2d 191 (4th Cir. 1978); Hardy Salt Company v. Southern Pacific Trans. Co., supra at 1167; United States v. Stoeco Homes, Inc., 498 F.2d 597, 608-609 (3d Cir. 1974), Cert. denied, 420 U.S. 927, 95 S.Ct. 1124, 43 L.Ed.2d 397 (1975).
 
 
 17
 Applying The Daniel Ball test to the waters at issue here, we agree with the District Court that Lake Minnetonka, and that portion of Minnehaha Creek above Minnetonka Mills, are not "navigable waters of the United States" as required for federal regulatory jurisdiction under § 10 of the Rivers and Harbors Act of 1899. The Daniel Ball test is bipartite: first, the body of water must be navigable in fact;[6] and second, it must itself, or together with other waters, form a highway over which commerce may be carried on with other states. All parties agree that both Lake Minnetonka, and that portion of Minnehaha Creek above Minnetonka Mills, are navigable in fact. These waters do not, however, form themselves, or in conjunction with other navigable waters, a continued highway over which interstate commerce can be conducted. Lake Minnetonka is located entirely within the State of Minnesota, with Minnehaha Creek as its sole connecting waterway. Although the portion of Minnehaha Creek above Minnetonka Mills is navigable, the remainder of the creek is not. Lake Minnetonka and the upper, navigable portion of Minnehaha Creek are not, therefore, part of a navigable interstate waterway, and federal regulatory jurisdiction under the Rivers and Harbors Act over these waters does not exist.
 
 
 18
 The Corps of Engineers contends, however, that federal regulatory jurisdiction under the Rivers and Harbors Act does not require that a body of water be part of an interstate waterway system, as long as it is a segment of a commercial highway, which may consist of water, rail or road connections. The Corps contends that since Lake Minnetonka and the upper portion of Minnehaha Creek have interstate road and rail connections, this is enough to make them "navigable waters of the United States" for the purposes of regulatory jurisdiction under the Act.
 
 
 19
 We disagree. Although the first prong of The Daniel Ball test has been broadened in later Supreme Court decisions,[7] the second prong of this test, requiring a navigable interstate linkage by water, has remained unchanged. In United States v. The Montello, 78 U.S. (11 Wall.) 411, 20 L.Ed. 191 (1871), the Supreme Court unequivocally stated:
 
 
 20
 If, however, the river is not of itself a highway for commerce with other states or foreign countries, or does not form such highway by its connection with other waters, and is only navigable between different places within the state, then it is not a navigable water of the United States, but only a navigable water of the state * * * .
 
 
 21
 Id., 78 U.S. (11 Wall.) at 415. See also Cardwell v. American River Bridge Co., 113 U.S. 205, 5 S.Ct. 423, 28 L.Ed. 959 (1885); Miller v. Mayor, Etc. of New York, supra, 109 U.S. at 395-396, 3 S.Ct. 228; Escanaba, Etc. Trans. Co. v. Chicago, supra, 107 U.S. at 682, 2 S.Ct. 185.
 
 
 22
 In Hardy Salt Company v. Southern Pacific Trans. Co., supra, a case almost factually identical to the one at bar, the Tenth Circuit rejected the argument that the Great Salt Lake in Utah was a navigable water of the United States for the purpose of jurisdiction under the Rivers and Harbors Act because it was a conduit for the transportation of goods which were shipped interstate by rail. That Court stated:
 
 
 23
 Although the definition of "navigability" laid down in The Daniel Ball has subsequently been modified and clarified * * * , its definition of "navigable water of the United States," insofar as it requires a navigable interstate linkage by water, appears to remain unchanged. See Economy Light & Power Co. v. United States, (256 U.S. 113, 121-124 (41 S.Ct. 409, 65 L.Ed. 847) (1921)); United States v. Utah, 283 U.S. 64, 75 (51 S.Ct. 438, 75 L.Ed. 844) * * * (1931); United States v. Crow, Pope & Land Enterprises, Inc., 340 F.Supp. 25, 31-36 (N.D.Ga.1972), appeal dismissed, 474 F.2d 200 (5th Cir. 1973).
 
 
 24
 Id. at 1167. Other courts which have recently considered this question have similarly concluded that entirely intrastate bodies of water, with no navigable interstate waterway linkage, are not subject to federal regulatory jurisdiction under the Rivers and Harbors Act. See State Water Control Bd. v. Hoffman, supra; United States v. Underwood, 344 F.Supp. 486, 489-491 (M.D.Fla.1972).[8]
 
 
 25
 We do not, by our holding, imply that Congress could not extend federal regulatory jurisdiction under its commerce power to include such bodies of water.[9] See Leslie Salt Co. v. Froehlke, 578 F.2d 742, 752-753 (9th Cir. 1978); United States v. Stoeco Homes, Inc., supra at 608-609. We hold only that such jurisdiction is not conferred by the Rivers and Harbors Act of 1899.[10]
 
 
 26
 B. Jurisdiction of the Corps of Engineers Over the
 
 
 27
 Construction of Dams and Placement of Riprap in
 
 Navigable Waters Under Section 404 of
 
 28
 the Federal Water Pollution Control Act.
 
 
 29
 The District Court found, and all parties agree, that Lake Minnetonka and Minnehaha Creek above Minnetonka Mills are "navigable waters" as that term is used in the Federal Water Pollution Control Act,[11] and, thus, the Corps of Engineers has jurisdiction under § 404 of the Act, 33 U.S.C. § 1344, to regulate the discharge of dredge or fill material into these waters. The parties disagree, however, as to whether the construction of dams and the placement of riprap constitute the discharge of dredge or fill material as envisioned by that section.
 
 
 30
 The District Court held that such activities do not come within the purview of § 404 because they do not constitute the discharge of a pollutant under § 301(a) of the Act, 33 U.S.C. § 1311(a).[12] The court held that although § 502(6), 33 U.S.C. § 1362(6), includes "rock, sand (and) cellar dirt" in the definition of "pollutant," the Act did not intend to extend federal jurisdiction to all matters which incidentally require rock or sand for construction. It held that since there was no evidence that the construction of dams or riprap significantly alter water quality, "there is no federal interest under the (Act) in the activity." Minnehaha Cr. Watershed Dist. v. Hoffman, supra at 886. The court declared 33 C.F.R. § 323.2(n), promulgated by the Corps, invalid insofar as it purports to regulate the construction of dams and riprap, and permanently enjoined the Corps from asserting regulatory jurisdiction over these activities in Lake Minnetonka and in that portion of Minnehaha Creek above Minnetonka Mills. Id.
 
 
 31
 We believe that the District Court interpreted the scope of the Act too narrowly. The Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. § 1251 Et seq., were enacted after a Congressional finding that "the (prior) national effort to abate and control water pollution has been inadequate in every vital aspect * * * ". S.Rep.No.92-414, 92d Cong., 1st Sess. 7 (1971), Reprinted in 2 Legislative History of the Water Pollution Control Act Amendments of 1972, 1415, 1425 (hereinafter "Legislative History "); U.S.Code Cong. & Admin.News 1972, pp. 3668, 3674. See EPA v. State Water Resources Control Board, 426 U.S. 200, 203, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976). The purpose of the Amendments was broad and remedial, with their stated objective being "(the) restor(ation) and main(tenance) (of) the chemical, physical, and biological integrity of the Nation's waters." Section 101(a), 33 U.S.C. § 1251(a). See State of Minn., By Spannaus v. Hoffman, 543 F.2d 1198, 1200 (8th Cir. 1976), Appeal dismissed, 430 U.S. 977, 97 S.Ct. 1672, 52 L.Ed.2d 373 (1977); United States v. Velsicol Chemical Corp., 438 F.Supp. 945, 946 (W.D.Tenn.1976). The House Committee on Public Works, in a report which accompanied the House bill, discussed this objective in the broadest possible terms:
 
 
 32
 Subsection (a) of section 101 declares the objective of this legislation to be the restoration and maintenance of the chemical, physical, and biological integrity of the Nation's waters.
 
 
 33
 The word "integrity" as used is intended to convey a concept that refers to a condition in which the natural structure and function of ecosystems is maintained.
 
 
 34
 Although man is a "part of nature" and a production of evolution, "natural" is generally defined as that condition in existence before the activities of man invoked perturbations which prevented the system from returning to its original state of equilibrium.
 
 
 35
 This definition is in no way intended to exclude man as a species from the natural order of things, but in this technological age, and in numerous cases that occurred before industrialization, man has exceeded nature's homeostatic ability to respond to change. Any change induced by man which overtaxes the ability of nature to restore conditions to "natural" or "original" is an unacceptable perturbation.
 
 
 36
 H.Rep.No.92-911, 92d Cong., 2d Sess. 76-77 (1972), Reprinted in 1 Legislative History 753, 763-764.
 
 
 37
 In keeping with far-reaching objectives of the Act "pollutant" is very broadly defined. Section 502(6), 33 U.S.C. § 1362(6), defines this term as follows:
 
 
 38
 The term "pollutant" means dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water. This term does not mean (A) "sewage from vessels" * * * or (B) water, gas, or other material which is injected into a well to facilitate production of oil or gas * * *.
 
 
 39
 "Pollution" is also defined by the Act to mean "the man-made or man-induced alteration of the chemical, physical, biological, and radiological integrity of water." Section 502(19), 33 U.S.C. § 1362(19).
 
 
 40
 We believe that the construction of dams and riprap in navigable waters was clearly intended by Congress to come within the purview of §§ 301 and 404 of the Act. By including rock, sand and cellar dirt in the list of polluting substances, Congress recognized that the addition of these substances could affect the physical, as well as the chemical and biological, integrity of a waterbody. Since the construction of dams or riprap admittedly involves the placement of rock, sand or cellar dirt into the body of water, such activities would appear to come within the plain meaning of the Act.
 
 
 41
 Our interpretation of the Act as subjecting the construction of dams and riprap in navigable waters to the Corps' permitting program under § 404 is reinforced by the regulations promulgated by the Corps. The Corps has defined "fill material" under § 404 as follows:
 
 
 42
 The term ("fill material") generally includes, without limitation, the following activities: Placement of fill that is necessary to the construction of any structure in a water of the United States; the building of any structure or impoundment requiring rock, sand, dirt or other material for its construction; site-development fills for recreational, industrial, commercial, residential, and other uses; causeways or road fills; dams and dikes; artificial islands; property protection and/or reclamation devices such as riprap, groins, seawalls, breakwaters, and revetments, beach nourishment; levees; fill for structures such as sewage treatment facilities; * * *.
 
 
 43
 33 C.F.R. § 323.2(n) (1977). Contemporaneous construction of a statute by those charged with its administration is entitled to great respect and should be held invalid only if the administrative regulations are unreasonable or inconsistent with the statute. T. L. Hunt, Inc. v. C.I.R., 562 F.2d 532, 535-536 (8th Cir. 1977).
 
 
 44
 It is evident from the legislative history of the Clean Water Act of 1977 that Congress was aware of the Corps' interpretation of § 404, and approved of it. The Senate Environment and Public Works Committee, in commenting on the Senate bill, stated:
 
 
 45
 Section 404 of the Federal Water Pollution Control Act Amendments of 1972 required a permit program to control the adverse effects caused by point source discharges of dredged or fill material into the navigable waters including: (1) the destruction and degradation of aquatic resources that results from replacing water with dredged material or fill material; and (2) the contamination of water resources with dredged or fill material that contains toxic substances.
 
 
 46
 The committee amendment is designed to reaffirm this intent And dispel the widespread fears that the program is regulating activities that were not intended to be regulated.
 
 
 47
 S.Rep.No.95-370, 95th Cong. 1st Sess. (1977), at 74-75, Reprinted in (1977) U.S.Code Cong. & Admin.News 4326, 4399-4400 (emphasis added).
 
 
 48
 Congressional intent that construction of dams and riprap in navigable waters be subject to the Corps' § 404 jurisdiction is also evident from the language of the 1977 Act itself. In § 67(b) of the Act, 33 U.S.C. § 1344(f)(1)(B), Congress exempted the discharge of fill material from § 404 permitting requirements if the discharge of fill was done "for the purpose of maintenance, including emergency reconstruction of recently damaged parts, of currently serviceable structures such as dikes, dams, levees, groins, riprap, breakwaters, causeways, and bridge abutments or approaches, and transportation structures."[13] It is obvious that an exemption for maintenance or emergency reconstruction of recently damaged parts of structures would be necessary only if such work is generally subject to § 404 permitting requirements.
 
 
 49
 We find no justification in the Act for the District Court's conclusion that a significant alteration in water quality must be demonstrated before the addition of a particular substance to navigable waters can be classified as the discharge of a pollutant. Congress has, by the inclusion of certain substances in the definition of "pollutant" found in § 502(6), 33 U.S.C. § 1362(6), determined that the discharge of these substances in navigable waters is subject to the Act's control requirements. The Act contains no provision that the listed substances are to be classified as pollutants and, thus, subject to the Act's control requirements, only upon a further administrative or judicial finding that their addition to navigable waters results in a significant decrease in water quality. Nor does the fact that the listed substances may not in themselves be commonly considered "toxic" or "contaminating" change this result. As observed by the Senate Environment and Public Works Committee above, the permit program established under § 404 of the Federal Water Pollution Control Act Amendments of 1972 was intended to control the degradation of aquatic resources that results from any replacement of water with fill material, as well as the degradation that results from the discharge of dredged or fill material which contains toxic substances. See S.Rep.No.95-370, Supra.
 
 
 50
 We similarly find no justification in the Act for the District Court's determination that whether the discharge of a particular substance listed in § 502(6) constitutes the discharge of a "pollutant" under the Act depends upon the purpose for which the discharge is made. Other than the specific exceptions listed in § 502(6) for sewage from vessels, and for water, gas or other material injected into a well to facilitate production of oil or gas, the Act contains no indication that the discharge of the substances listed in § 502(6) constitutes the discharge of a pollutant if the discharge is made for some purposes, and not if it is made for others.
 
 
 51
 The District Court further held, and the appellees urge, that the construction of dams and the placement of riprap in Lake Minnetonka and in Minnehaha Creek should not be subject to the Corps' § 404 permitting program because that program is duplicative of state and local regulatory efforts. As commendable as such state and local efforts might be, they cannot supplant the duty of the Corps to enforce the provisions of the Act. It is important to note, however, that under § 67(b) of the Clean Water Act of 1977, a state may administer its own permit program for the regulation of the discharge of dredged or fill materials into navigable waters, other than traditionally navigable waters and adjacent wetlands, after approval of the state plan by the Administrator of the Environmental Protection Agency. Upon E.P.A. approval of a state plan, the federal program for the regulation of the discharge of dredged or fill materials into these waters will be suspended. See 33 U.S.C. § 1344(g)-(L ). If the State of Minnesota wishes to administer its own permit program for the discharge of dredged or fill material into these waters, it may make application for this authority in accordance with the statutory procedure. Until it does and until its program is approved, the Corps must fulfill its statutory obligation.
 
 
 52
 C. Summary.
 
 
 53
 In summary, we affirm the order of the District Court insofar as it declares that Lake Minnetonka and that portion of Minnehaha Creek above Minnetonka Mills are not navigable waters of the United States within the meaning of the Rivers and Harbors Act of 1899, insofar as it directs the Secretary of the Army to withdraw the "Determination of Navigability" of February 14, 1975, and insofar as it permanently enjoins the Corps of Engineers from asserting regulatory jurisdiction under the Rivers and Harbors Act of 1899 over these waters. We reverse the order of the District Court insofar as it declares 33 C.F.R. § 323.2(n), promulgated by the Corps under § 404 of the Federal Water Pollution Control Act, to be invalid, and insofar as it permanently enjoins the Corps from asserting regulatory jurisdiction over the construction of dams and the placement of riprap in Lake Minnetonka and that portion of Minnehaha Creek above Minnetonka Mills under § 404 of that Act.
 
 
 54
 Affirmed in part and reversed in part. Each party will bear its own costs.
 
 
 
 *
 The Honorable TALBOT SMITH, Senior District Judge, Eastern District of Michigan, sitting by designation, participated in the post-argument conference and concurred in this opinion prior to his death on December 21, 1978
 
 
 [1]
 The original Federal Water Pollution Control Act was passed in 1948, frequently revised and codified at 33 U.S.C. § 1151 Et seq. The Act was extensively revised by the Federal Water Pollution Control Act Amendments of 1972, Pub.L.No.92-500, 86 Stat. 816 (1972). Extensive revisions were again made by the Clean Water Act of 1977, Pub.L.No.95-217, 91 Stat. 1566 (1977)
 
 
 [2]
 The appellees are the Lake Minnetonka Conservation District, a political subdivision of the State of Minnesota, which is charged by statute with broad responsibilities for regulating the use of Lake Minnetonka, including research regarding the lake and eliminating lake pollution; the Minnehaha Creek Watershed District, also a political subdivision of the State of Minnesota, which is statutorily charged with overall planning for the Minnehaha Creek watershed basin including Lake Minnetonka; the Lake Minnetonka Association, a nonprofit corporation dedicated to the preservation and improvement of the residential and recreational qualities of the lake; and two homeowners residing on lakeshore property
 
 
 [3]
 The Daniel Ball v. United States, 77 U.S. (10 Wall.) 557, 19 L.Ed. 999 (1871), was a libel action, brought under the Act of July 7, 1838, 5 Stat. 304, and under the Act of August 30, 1852, 10 Stat. 61
 
 
 [4]
 Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403, states in its entirety:
 The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same.
 
 
 [5]
 See, e. g., Cardwell v. American River Bridge Co., 113 U.S. 205, 5 S.Ct. 423, 28 L.Ed. 959 (1885); Miller v. Mayor, Etc., of New York, 109 U.S. 385, 3 S.Ct. 228, 27 L.Ed. 971 (1883); Escanaba, Etc., Trans. Co. v. Chicago, 107 U.S. 678, 2 S.Ct. 185, 27 L.Ed. 442 (1883); South Carolina v. Georgia, 93 U.S. 4, 23 L.Ed. 782 (1876); United States v. The Montello, 78 U.S. (11 Wall.) 411, 20 L.Ed. 191 (1871)
 
 
 [6]
 "Navigability in fact" has been broadened by later decisions of the Supreme Court to include bodies of water which were navigable in their natural state although they may not presently be so, Economy Light & Power Co. v. United States, 256 U.S. 113, 123, 41 S.Ct. 409, 65 L.Ed. 847 (1921), or which, although traditionally considered to be nonnavigable, might be made navigable with reasonable improvements. United States v. Appalachian Electric Power Co., 311 U.S. 377, 404-410, 61 S.Ct. 291, 85 L.Ed. 243 (1940)
 
 
 [7]
 See note 6, Supra
 
 
 [8]
 Utah v. United States, 403 U.S. 9, 91 S.Ct. 1775, 29 L.Ed.2d 279 (1971), cited by the Corps, is not to the contrary. The sole issue in that case was whether the United States, or the State of Utah, owned the original bed of the Great Salt Lake. The Court held that Utah's claim to the lake bed depended on whether the Great Salt Lake was navigable at the time of Utah's admission to the union. The Court found that the lake was navigable, and upheld Utah's claim. It determined navigability in accordance with the first prong of The Daniel Ball test: whether the lake, at the time of Utah's admission to the Union, was used, or was susceptible of being used, as a highway for interstate commerce. The Court did not apply the second prong of The Daniel Ball test, since "the fact that the Great Salt Lake is not part of a navigable interstate or international commercial highway in no way interferes with the principle of public ownership of its bed." Id. at 10, 91 S.Ct. at 1776. This case, thus, has no bearing on whether a body of water must be part of a navigable interstate waterway in order to be a "navigable water of the United States" under the Rivers and Harbors Act
 
 
 [9]
 Indeed, it is apparent from the legislative history of the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. § 1251 Et seq., that Congress intended to extend federal regulatory jurisdiction under that Act to navigable waters not reached under prior legislation. See Conference Report to Accompany S.2770, Reprinted in 1 Legislative History of the Water Pollution Control Act Amendments of 1972, 281, 327 (hereinafter "Legislative History "). See also remarks of Rep. Dingell, Conference Committee member, Reprinted in 1 Legislative History at 250
 
 
 [10]
 In light of our conclusion that the Rivers and Harbors Act of 1899 does not extend federal regulatory jurisdiction over Lake Minnetonka and the upper portion of Minnehaha Creek, we need not address appellees' contention that the Water Resources Development Act of 1976, 33 U.S.C. § 59L, would preclude such jurisdiction
 
 
 [11]
 The term "navigable waters" was defined in § 502(7) of the Federal Water Pollution Control Act Amendments of 1972 to include "the waters of the United States, including the territorial seas." This definition was not changed by the Clean Water Act of 1977. See 33 U.S.C. § 1362(7)
 
 
 [12]
 Section 301(a) of the Federal Water Pollution Control Act, 33 U.S.C. § 1311(a), provides:
 Except as in compliance with this section and sections 1312, 1316, 1317, 1328, 1342 and 1344 of this title, the discharge of any pollutant by any person shall be unlawful.
 Section 404, 33 U.S.C. § 1344, allows the discharge of "dredged or fill material into the navigable waters at specified disposal sites" after the issuance of a permit for the discharge by the Army Corps of Engineers.
 
 
 [13]
 This exemption is inapplicable, however, if the discharge of the dredged or fill material is "incidental to any activity having as it purpose bringing an area of the navigable waters into a use to which it was not previously subject, where the flow or circulation of navigable waters may be impaired or the reach of such waters be reduced * * *." § 67(b), 33 U.S.C. § 1344(f)(2)