**Robert J. and Bettie H. LOVING, et al., Plaintiffs,**

**v.**

**Clifford ALEXANDER, Secretary, Department of the Army, et al., Defendants.**

**Civ. A. No. 79–0254.**

United States District Court, W. D. Virginia.

Sept. 30, 1982.

---

William T. Wilson, Covington, Va., William B. Poff, Law Offices, Woods, Rogers, Muse, Walker & Thornton, Roanoke, Va., for plaintiffs.

Jean B. Weld, Asst. U. S. Atty., Roanoke, Va., Richard W. Smith, Timberlake, Smith, Thomas & Moses, Staunton, Va., for defendants.

## OPINION

TURK, Chief Judge.

This action is brought by approximately sixty-seven riparian owners along a segment of the Jackson River in Alleghany County, Virginia, against the Secretary of the Department of Army, the United States Corps of Engineers, and three officers of the Department of Army. Plaintiffs seek a judgment declaring that the Jackson River is nonnavigable from the mouth of Dunlap Creek at Covington to the base of the Gathright Dam (hereafter the "Jackson River Segment"), and an injunction barring the federal defendants from allowing public access in the Jackson River Segment; or alternatively, compensation for a "taking" by the United States. As the federal defendants have asserted regulatory jurisdiction over the Jackson River pursuant to the Rivers and Harbors Act of 1899, 33 U.S.C. §§ 401, *et seq.*, this court has jurisdiction under 28 U.S.C. § 1331. And as the defendant's determination of navigability is an agency action, plaintiffs have stated a

cause of action under the Administrative Procedure Act, 5 U.S.C. §§ 701–706 [1].

In 1946, Congress authorized construction of the Gathright Dam on the Jackson River, Virginia, for purposes of flood control, water quality control, and recreation. The United States Army Corps of Engineers (hereafter "Corps") began to acquire land for the project in 1967. A large portion of this land was formerly part of the T. M. Gathright Wildlife Management Area. Actual construction of the dam was started in 1968. An action for injunctive and declaratory relief, on environmental grounds, against the Gathright Dam project was rejected by this court in *Cape Henry Bird Club v. Laird*, 359 F.Supp. 404 (W.D.Va. 1973) (C. J. Dalton), *aff'd*, 484 F.2d 453 (4th Cir. 1973).

Prior to the construction of the dam, the Virginia Commission of Game and Inland Fisheries (hereafter "Game Commission") had stocked and maintained over eleven miles of the Jackson River flowing through the Wildlife Management Area as a "put-and-take" trout fishery. The impoundment of the Jackson River by the dam resulted in the loss of much of the "put-and-take" trout fishery. Because mitigation under the Fish and Wildlife Coordination Act of 1958 for the loss of this fishery was not authorized by the dam project legislation, the Corps and Game Commission contemplated that a nineteen mile stretch of the Jackson River below the dam would be used for a trout fishery. In 1971, the Game Commission agreed to develop and maintain the proposed downstream trout fishery, provided that the Jackson River was found to be a navigable water of the United States. As part of this agreement, the Corps purchased, at a cost of approximately $50,000, six downstream access points for future licensing to the Commission.

Although the Corps had made a preliminary determination in its first and supplemental Environmental Impact Statements that the Jackson was a navigable river, it subsequently commissioned a study of the navigability of the Jackson River by John W. Knapp of the Virginia Military Institute Research Laboratories, Inc. On February 23, 1978, the Corps issued a "Determination of Navigability—Jackson River, Virginia" under the authority of 33 C.F.R. 329.14(b).[2]

This determination was based on the study prepared by Knapp and states that, under the standards set out in 33 C.F.R. §§ 329.1 *et seq.*,[3] the Jackson River is a

---

1. Defendants' motion to dismiss for lack of subject matter jurisdiction and jurisdiction over the defendants, (which the court took under advisement while evidence on the merits was presented), will accordingly be denied.

2. This regulation is promulgated under the authority of 33 U.S.C. §§ 401 *et seq.*

3. The standards set forth in 33 C.F.R. for determinations of navigability are as follows:

 § 329.5 *General scope of determinations.*
 The several factors which must be examined when making a determination whether a waterbody is a navigable water of the United States are discussed in detail below. Generally, the following conditions must be satisfied:
 (a) Past, present, or potential presence of interstate or foreign commerce;
 (b) Physical capabilities for use by commerce as in paragraph (a) of this section; and
 (c) Defined geographic limits of the waterbody.
 § 329.6 *Interstate or foreign commerce.*
 (a) *Nature of Commerce: type, means, and extent of use.* The types of commercial use

of a waterway are extremely varied and will depend on the character of the region, its products, and the difficulties or dangers of navigation. It is the waterbody's capability of use by the public for purposes of transportation of commerce which is the determinative factor, and not the time, extent or manner of that use. As discussed in § 329.9 of this part, it is sufficient to establish the potential for commercial use at any past, present or future time. Thus, sufficient commerce may be shown by historical use of canoes, bateaux, or other frontier craft, as long as that type of boat was common or well-suited to the place and period. Similarly, the particular items of commerce may vary widely, depending again on the region and period. The goods involved might be grain, furs, or other commerce of the time. Logs are a common example; transportation of logs has been a substantial and well-recognized commercial use of many navigable waters of the United States. Note, however, that there mere presence of floating logs will not of itself make the river "navigable"; the logs must have been related to a commercial venture. Similarly, the presence of recrea-

navigable water of the United States from its mouth to its confluence with Back Creek at river mile 55 for the purposes of exercising Corps regulatory jurisdiction. This action arises out of the Corps' determination that the Jackson River is a navigable water of the United States.

In October 1979, plaintiffs filed suit challenging the Corps' determination of navigability insofar as it applies to the Jackson River Segment, and the plan to allow public access for fishing and other recreational uses in the Jackson River Segment. The complaint states that each plaintiff owns real property which borders and includes portions of the Jackson River from the base of the Gathright Dam to the mouth of Dunlap Creek and that plaintiffs seek to protect their property from being "taken" without just compensation by the Corps. Although the complaint contains seven counts, in essence the plaintiff's allege that the Corps' determination of navigability is not in accordance with law because the Jackson River Segment is nonnavigable.

In addition to the trial memoranda submitted by the parties, the Virginia Farm Bureau Federation filed an amicus curiae brief in support of the plaintiffs' position, and the National Wildlife Federation-Virginia Wildlife Federation and Trout Unlimited filed two amicus curiae briefs in support of the defendants' position. The court has received evidence during three days of hearings, along with several depositions and reports. Defendants presented two expert witnesses, Harold J. Wiberg and John W. Knapp, who studied the Jackson River and concluded that it is navigable. William R. Walker, defendants' expert, came to the opposite conclusion. These experts' reports were submitted as exhibits.

In large part, each expert's opinion was based upon testimony found in three state court trial transcripts.[4] The state court trial transcripts were also introduced as exhibits in this action, and the testimony of the witnesses at the state trials is admissible under Federal Rule of Evidence 804(b)(1). The relevant facts derived from

tional craft may indicate that a waterbody is capable of bearing some forms of commerce, either presently, in the future, or at a past point in time.

(b) *Nature of commerce: interstate and intrastate.* Interstate commerce may of course be existent on an intrastate voyage which occurs only between places within the same State. It is only necessary that goods may be brought from, or eventually be destined to go to, another State. (For purposes of this regulation, the term "interstate commerce" hereinafter includes "foreign commerce" as well.)

4. The three state cases are *Hot Springs Lumber and Manufacturing Co. v. Revercomb*, 106 Va. 176, 55 S.E. 580 (1906); *Hot Springs Lumber and Manufacturing Co. v. Revercomb*, 110 Va. 240, 65 S.E. 557 (1909); and *Boerner v. McCallister*, 197 Va. 169, 89 S.E.2d 23 (1955). In the first *Revercomb* case, Mr. Revercomb, who owned real property above the present site of the Gathright Dam and below Back Creek, brought an action to recover damages for injury to his land allegedly caused by a log drive down the Jackson River in 1905 by the Hot Springs Lumber Company. Revercomb claimed, among other things that the Jackson River was a private, nonfloatable stream, that the defendants' use of it was therefore illegal, and that the defendants negligently drove the logs against his land. Although the jury verdict and judgment was for Mr. Revercomb, the

Supreme Court of Appeals of Virginia reversed because Revercomb's pleadings insufficiently alleged the nonfloatability of the river. 106 Va. 176, 55 S.E. 580 (1906).

In 1907, Revercomb amended his declaration to include an allegation that the Jackson River was not capable of profitable use as a highway for commerce. Testimony in this second trial produced 224 pages of transcript. The jury verdict and judgment were again for Mr. Revercomb. On Appeal, the Supreme Court of Appeals of Virginia affirmed. 110 Va. 240, 65 S.E. 557 (1909).

In *Boerner v. McCallister*, Mr. McCallister sued for an order enjoining Mr. Boerner from fishing in the Jackson at the points where it flowed through McCallister's land. Boerner's defense was that the Jackson was navigable and therefore a public waterway. After considering evidence of the historical usage of the Jackson, the trial court found that the Jackson's characteristics made it "impractical and unprofitable" for commercial use and that the Jackson "is a non-navigable stream...." On appeal, the Supreme Court of Appeals of Virginia affirmed, stating that there was substantial evidence to support the chancellor's conclusion and resolving all conflicts in the evidence in favor of the prevailing party. 197 Va. 169, 89 S.E.2d 23 (1955).

all the evidence presented by the parties in this action are as follows:

The Jackson River originates in Highland County, Virginia, and flows approximately 95 miles downstream through Bath and Alleghany Counties, Virginia. It joins the Cowpasture River near Iron Gate in Alleghany County, and together these rivers form the James River.[5] Below Covington, Virginia, the river flows to the east. At Covington, it turns abruptly to the north and skirts the Alleghany Front. The entire river falls about 21 feet per mile and the average flow is 486 cubic feet per second ("cfs") with a seven day, ten year low flow of 0.158 cfs. The total length of the river contains natural obstructions, such as falls and riffles, as well as artificial obstructions such as two dams and various bridges.

The Jackson River Segment is relatively narrow, crooked, rocky and shallow. It falls from 9 to 12 feet per mile and has an average flow at the Falling Springs Station, which is near the midpoint of the disputed segment, of 491 cfs. The water depth ranges from about ten inches to 6 feet and it is approximately 40 to 100 feet wide.

Historically, the lower part of the Jackson River below Dunlap Creek at Covington was regularly used for bateaux transportation of iron, flour and other commercial produce from the late 18th century until the Civil War period. Within the Jackson River Segment, railroad cross ties were floated down the river from Falling Spring, (which is below the present site of the Gathright Dam), to Covington in 1884. In 1895, E. N. Williams and G. A. McCallister helped A. D. Kincaid float about 60 walnut logs down the Jackson from around Back Creek, (which is above the present site of the Gathright Dam), to Greaver's Mill.

In the fall of 1902, a lumber company called Sipes and Alexander attempted to float 3,000 to 4,000 board feet of logs down the river from Back Creek to its mill at Covington. Although Sipes and Alexander made two drives in an attempt to get these logs to their boom and mill in Covington, they were largely unsuccessful because the water level was either too low, (causing the logs to get stuck in the riverbed), or too high, (causing the logs to run off the river banks onto the farmlands adjoining the river). Many of these logs remained in the river at the time of the second *Revercomb* trial.

In early 1903, Alexander, one of the principals in Sipes and Alexander, formed the Jackson River Lumber Company. This company made many improvements in the Jackson River to assist in its log floating operations, such as constructing cribbings to prevent logs from going out onto land and blasting river rocks to prevent logs from snagging and forming jams. The Jackson Lumber Company made two drives in the spring of 1903 when the water level was sufficiently high to float logs. Nevertheless, Jackson Lumber Company was able to get only 10% of its logs from Back Creek to within three or four miles of its boom in Covington. This was due at least in part to Revercomb's refusal to let the company's men onto his land in order for them to push logs which had run aground back into the river. All in all, Sipes and Alexander and Jackson Lumber Company together attempted to drive 8,000 or 9,000 logs from Back Creek to Covington during approximately four drives from fall of 1902 to spring of 1903.

In 1903, Jackson Lumber Company was close to bankruptcy because it had spent too much on cutting logs which it could not mill because of the failure of its drives down the river. Nevertheless, Jackson Lumber Company continued to float its logs down the river until Revercomb obtained an injunction prohibiting it from floating logs past his property in the same year.

Nearly bankrupt and enjoined from floating logs down the Jackson, Jackson Lumber Company sold its timber that was still in

---

**5.** The James River flows into the Chesapeake Bay, which in turn flows into the Atlantic Ocean. Because the James and Chesapeake are navigable, the Jackson River, (if itself navigable), is part of a navigable interstate waterway linkage, (which is required for a finding of navigability), even though it is located entirely within Virginia.

the water to Hot Springs Lumber and Manufacturing Company and ceased all operations in 1903 or 1904. Ice on the river then caused the old Jackson Lumber Company boom to break, but about 400 or 500 logs that had been in the boom went into the Hot Springs boom at Covington and were subsequently milled by Hot Springs.

From 1904 to 1907, the Hot Springs Lumber and Manufacturing Company floated 10,000 to 12,000 logs, consisting of over two million board feet of timber, from Back Creek to its mill and boom at Kincaid, which is downstream from the Gathright Dam and thus within the disputed segment. Hot Springs had opened a mill at Kincaid not because the river was better for floating above Kincaid, but because the boom at Covington was insufficient and there was no reason to drive logs the extra river length to Covington when the railroad freight charges were about the same from Kincaid as from Covington. The lumber became part of the interstate commerce stream once it got onto the railroad.

The Hot Springs timber drives were not without difficulty—logs would sometimes snag on rocks and form huge jams; when the water overflowed the low riverbanks, logs would float ashore and men would have to push them back into the channel; and logs would get stranded on rocks when the river subsided. Nevertheless, it was customary for loggers to follow floating timber to push logs off land and break up jams, and experienced loggers rated the Jackson favorably as a "good stream to drive logs...." Government Exhibit 8,223. Indeed, the Jackson could be driven with less labor than other rivers because there was "not so many bars and back channels to work out [and] not such big waters on Jackson River to drive the logs on the shore...." Government Exhibit 8,319.

The Jackson, however, could not float logs unless rains caused about a two foot rise in the water level. As to the regularity and predictability of the river rises needed for floating logs, such rises as had floated 8,000 to 9,000 logs from Back Creek to Kincaid in March, 1905, could be counted on to occur several times a year. These rises were not freshets, which would wash logs out onto the river banks, but rises of only a few feet that would sometimes last for as much as ten days. One witness put it this way: "When it rains, it rises," indicating that a good rainy season caused the river to rise as high as was needed for logdriving. Government Exhibit 8,273.

In 1907, the second *Revercomb* trial resulted in a $1,600 jury verdict being awarded against Hot Spring Lumber and Manufacturing Company. Thereafter, Hot Springs stopped floating logs on the Jackson River. In 1939, however, John Bradly employed John E. Perkins and about eleven other men to do some "ball hooding." This consisted of cutting timber growing on steep mountains and throwing or sliding the logs off the mountains into pools in the river. The logs were then floated about a quarter of a mile downstream to Bradly's saw mill where they were sawed into lumber and then hauled to Kincaid and placed on freight trains. Bradly's saw mill was a commercial operation.

Presently, there is no commercial navigation on the Jackson River Segment. In addition, no commercial navigation can reasonably be expected to develop on the Jackson River Segment in the future because it would be economically unfeasible to make this portion of the river commercially navigable.

The Jackson River Segment, however, is susceptible to various recreational uses. Canoes can navigate the upper river without trouble except during late summer, and canoeing experts consider the Jackson to be a very fine canoeing stream, except for troubles with landowners along the river. Thus, canoists are restricted to certain sections of the upper river unless they choose to ignore the landowners. In addition, the Jackson River Segment could be an ideal cold water fishery because of the quality of its limestone water and special design features in the Gathright Dam which will allow controlled discharge of water at optimum temperature and dissolved oxygen.

■ This action presents three issues for the court's determination: first, whether the Jackson River Segment [6] is a navigable water of the United States; second, if the disputed segment is navigable, whether it comes within the Corps' regulatory jurisdiction under the Rivers and Harbors Act; and third, whether the public is entitled to use the river without the government having to pay the plaintiffs compensation for a "taking" of their property. The court will consider these issues *seriatim*.

■ The determination of whether a river is a navigable water of the United States is a question of federal law to be answered according to the legal principles recognized and applied in the federal courts.[7] *United States v. Holt State Bank*, 270 U.S. 49, 55–56, 46 S.Ct. 197, 199, 70 L.Ed. 465 (1926). The essential elements of the federal definition of navigability were first set forth in *The Daniel Ball*, 77 U.S. (10 Wall.) 557, 19 L.Ed. 999 (1870), which states that:

> Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. And they constitute navigable waters of the United States within the meaning of acts of Congress, in contradistinction from the navigable waters of the States, when they form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other States

or foreign countries in the customary modes in which such commerce is conducted in water.

*Id.* at 563. These legal principles were expanded upon in *The Montello*, 87 U.S. (20 Wall.) 430, 22 L.Ed. 391 (1874), where the Court defined the terms "navigability" and "navigation" to mean a stream's "capability of use by the public for purposes of transportation and commerce," *id.* at 442, and noted that "the true test of navigability . . . does not depend on the mode by which commerce is, or may be, conducted, nor the difficulties attending navigation." *Id.* at 441.

■ The Court subsequently pointed out, however, that "to give [a waterway] the character of a navigable stream, it must be generally and commonly useful to some purpose of trade or agriculture." *Leovy v. United States*, 177 U.S. 621, 634, 20 S.Ct. 797, 802, 44 L.Ed. 914 (1900). Thus, the Court has found various waters nonnavigable in cases where transportation is exceptional and only for short intervals in times of temporary high water. *See e.g., Oklahoma v. Texas*, 258 U.S. 574, 42 S.Ct. 406, 66 L.Ed. 771 (1922); *United States v. Rio Grande Dam and Irrig. Co.*, 174 U.S. 690, 19 S.Ct. 770, 43 L.Ed. 1136 (1899). In one case finding a river to be navigable the court noted that the river's "susceptibility of use as a highway for commerce was not confined to exceptional conditions or short periods of temporary high water. . . ." *United States v. Utah*, 283 U.S. 64, 87, 51 S.Ct. 438, 445, 75 L.Ed. 844 (1931). These cases illustrate that susceptibility for use or actual usage implies regularity and predictability of usage. "If the waterway is mere-

---

**6.** The navigability of only a portion of a river may be determined irrespective of the navigability of the river at any other point. *United States v. Appalachian Electric Power Co.*, 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 (1940); *United States v. Crow, Pope & Land Enterprises, Inc.*, 340 F.Supp. 25 (N.D.Ga.1972), *appeal dismissed*, 474 F.2d 200 (5th Cir. 1973).

**7.** Amicus curiae Trout Unlimited urges this court to consider the test of navigability adopted by some states which defines navigable waters to include those waters which are suitable only for public recreational use. *See, e.g.,*

*Kelley ex rel. MacMullan v. Hallden*, 51 Mich. App. 176, 214 N.W.2d 856 (1974). *Kelley* does espouse a well-reasoned test of navigability; nevertheless, federal precedent is contra. *See George v. Beavark, Inc.*, 402 F.2d 977, 981 (8th Cir. 1968) (float fishing on a stream does not render the stream navigable in fact). Consequently, the court is constrained to conclude that the recreational use test of navigability should not be used to determine whether the Jackson River Segment is a navigable water of the United States.

ly capable of exceptional transportation during periods of high water, it is not navigable." *Puget Sound Power & Light Co. v. Federal Energy Regulatory Commission,* 644 F.2d 785, 787 (9th Cir. 1980).

The most recent refinement of the federal test of navigability was articulated in *United States v. Appalachian Electric Power Co.,* 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 (1940). *Appalachian Power* established a three pronged test of (1) present use or suitability for use, (2) suitability for future use by making reasonable improvements, or (3) past use or suitability for past use. *See, Rochester Gas and Electric Corp. v. Federal Power Commission,* 344 F.2d 594, 596 (2d Cir. 1965); *United States v. Crow, Pope & Land Enterprises, Inc.,* 340 F.Supp. 25, 34 (N.D.Ga.1972), *appeal dismissed,* 474 F.2d 200 (5th Cir. 1973). In addition, *Appalachian Power* reaffirmed that a finding of navigability is inextricably bound with use or susceptibility for use for commercial purposes. 311 U.S. at 416, 61 S.Ct. at 303 (use of pleasure boats shows "the availability of the stream for the simpler types of *commercial* navigation") (accent added).

■ Because navigability is a factual question, each determination of navigability rests upon the particular facts of each case. *United States v. Utah,* 283 U.S. 64, 87, 51 S.Ct. 438, 445, 75 L.Ed. 844 (1931). The legal test of navigability is thus flexible enough to allow a finding of navigability from evidence of such varied commercial uses as "the carriage of ocean liners to the floating out of logs." 311 U.S. 377, 405, 61 S.Ct. 291, 298, 85 L.Ed. 243 (1940). Finally, once a river is navigable it remains navigable even if changed circumstances make present commercial use impractical. *Economy Light & Power Co. v. United States,* 256 U.S. 113, 41 S.Ct. 409, 65 L.Ed. 847 (1921).

■ In summary, the Jackson River Segment may be found to be a navigable water of the United States if there is sufficient evidence that it is either historically navigable, presently navigable, or may be made navigable in the future by reasonable improvements.

■ The Corps' determination that the Jackson River above Covington is navigable rests upon the historical evidence that the river was used to float logs from Back Creek to Kincaid and Covington. This determination is subject to *de novo* review by the court. *Minnehaha Creek Watershed District v. Hoffman,* 449 F.Supp. 876, 881 (D.Minn.1978), *aff'd in part, rev'd in part on other grounds,* 597 F.2d 617 (8th Cir. 1979). Nevertheless, the Corps' determination of navigability is entitled to substantial weight, *Hartman v. United States,* 522 F.Supp. 114, 117 (D.S.C.1981), and should not be rejected unless the agency's action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Plaintiffs contend that the evidence of log floating is insufficient to support a finding that the Jackson River Segment is historically navigable. They argue that the log drives on the Jackson River Segment in the early 1900's were in fact short-lived, unsuccessful efforts by logging companies that consequently failed to prosper; that logs could float on the upper Jackson only during short, unpredictable periods of high water, and that even then, the logs could not be brought to mill without the help of several men.

Plaintiff's rely primarily upon *United States v. Rio Grande Dam and Irrigation Co.,* 174 U.S. 690, 19 S.Ct. 770, 43 L.Ed. 1136 (1899), to support their argument that defendants' evidence of log floatage is insufficient to establish navigability. In *Rio Grande,* the Court found the Rio Grande to be nonnavigable within the limits of New Mexico and stated that "[t]he mere fact that logs . . . are floated down a stream occasionally and in times of high water does not make it a navigable river." *Id.* at 698, 19 S.Ct. at 773. The Court's reason for finding the river nonnavigable was that "[i]ts use for any purposes of transportation has been and is exceptional, and only in times of temporary high water." *Id.* at 699, 19 S.Ct. at 773. In short, the Court concluded that the Rio Grande was not regular-

ly and predictably used for trade and travel, and consequently, not a navigable water of the United States.

Plaintiffs argue that rationale employed in *Rio Grande* is equally applicable to this case. The court, however, is not persuaded that *Rio Grande* precludes a finding that the Jackson River Segment is historically navigable. The Jackson River Segment was capable of more than exceptional transportation during periods of high water. Although the river would not float logs unless rains caused a two foot rise in the water level, such rises were not extraordinary freshets of high water, but rather natural and ordinary increases in the water level which usually accompanied a good rainy season. Moreover, such rises sufficient to float logs could be predicted with reasonable certainty to regularly occur at least several times a year. Moreover, there is no need for "the navigation [to] be open at all seasons of the year, or at all stages of the water," for a river to be found navigable. *Economy Light & Power Co. v. United States,* 256 U.S. 113, 122, 41 S.Ct. 409, 412, 65 L.Ed. 847 (1921). The fact that Hot Springs Lumber Company floated over 10,-000 logs from Back Creek to Kincaid during drives that lasted from eight to nine days illustrates that such commercial navigation was not restricted to times of temporary high water.

Although the Jackson River logging operations were not as extensive or long lasting as those described in *Wisconsin Public Service Corp. v. Federal Power Commission,* 147 F.2d 743 (7th Cir. 1945), navigability does not depend upon the number of yard feet of timber transported each year but rather "upon the stream's usefulness as a transportation mechanism for commerce." *Puget Sound Power & Light Co. v. Federal Energy Regulatory Commission,* 644 F.2d at 789.

> Nor is it necessary for navigability that the use should be continuous. The character of the region, its products and the difficulties or dangers of the navigation influence the regularity and extent of the use. Small traffic compared to the available commerce of the region is sufficient. Even absence of use over long periods of years, because of changed conditions, the coming of the railroad or improved highways does not affect the navigability of rivers in the constitutional sense.

311 U.S. at 409–410, 61 S.Ct. at 300–301 (footnotes omitted). Hot Springs Lumber Company's clearly successful floatage of over 10,000 logs to its mill at Kincaid is sufficient to support a finding that the Jackson River Segment was useful as a transportation mechanism for commerce.

As to the difficulty with which the lumber companies floated their logs, the men who conducted the log drives testified that the Jackson required less labor to float logs than other streams and that such activity as breaking up jams and pushing logs off the riverbanks was customary. But even conceding that the logs were driven on the Jackson River Segment with difficulty, and that usage of the river was not extensive, or long and continuous, "[t]hese conditions do not preclude navigability." *Puget Sound Power & Light Co.,* 644 F.2d at 789.

> The capability of use by the public for purposes of transportation and commerce affords the true criterion of the navigability of a river, rather than the extent and manner of that use.

> \* \* \* \* \* \*

> The vital and essential point is whether the natural navigation of the river is such that it affords a channel for useful commerce. If this be so, the river is navigable in fact, although its navigation may be encompassed with difficulties by reason of natural barriers, such as rapids and sandbars.

*The Montello,* 87 U.S. (20 Wall.) 430, 441–443, 22 L.Ed. 391 (1874).

Lastly, as to the success of the logging companies that floated logs down the Jackson, it is important to note that Jackson River Lumber Company did not cease log floating operations, (despite the difficulties it faced in floating its timber), until Revercomb obtained an injunction prohibiting the company from floating logs past his land.

And the fact that that company went under does not mean that it was not a commercial venture. In addition, plaintiffs overlook the fact that Hot Springs Lumber Company was clearly a successful business venture. In light of the $1,600 jury verdict awarded against it in 1907, the fact that Hot Springs stopped floating logs after 1907 does not suggest that the Jackson River Segment was not useful for commercial navigation.

 Plaintiffs also contend that the three state court decisions which found against the navigability of the Jackson should be given great weight and credence as evidence that the Jackson River Segment is in fact nonnavigable. However, plaintiff's and amicus curiae Virginia Farm Bureau Federation both place undue reliance upon these cases. In the first place, the federal defendants were not parties to the Virginia cases and therefore are not bound by the results therein. *Brewer-Elliott Oil & Gas Co. v. United States,* 260 U.S. 77, 87, 43 S.Ct. 60, 64, 67 L.Ed. 140 (1922). In addition, the Supreme Court of Appeals of Virginia did not render a decision on the merits concerning the navigability of the Jackson River above Covington in the *Revercomb* cases. The appellate court in the first *Revercomb* case reversed the jury verdict and judgment for Revercomb; and in the second *Revercomb* case it affirmed the jury verdict and judgment for Revercomb, but stated that "the evidence is not properly before us, and we are precluded from a consideration of the instructions and the judgment refusing to set aside the verdict as contrary to the evidence." 110 Va. 240, 272, 65 S.E. 557, 562 (1909). The Virginia appellate court's affirmance in *Boerner* of the chancellor's conclusion that the Jackson was nonnavigable may be regarded properly as a decision on the merits, as the appellate court found the chancellor's conclusion to be supported by substantial evidence. Nevertheless, there is no evidence that either the trial court or appellate court considered the historical evidence concerning

Hot Springs Lumber Company's clearly successful log drives from Back Creek to Kincaid. This court, consequently, is not precluded by the state court decisions from finding that the Jackson River is a navigable water under federal law.

 The evidence introduced at trial is sufficient to support a finding that the Jackson River Segment was historically used as a highway for useful commerce. Railroad cross ties were floated down the river from Falling Spring to Covington in 1884. In 1895, about 60 walnut logs were floated down the river within the disputed area. The Sipes and Alexander, and Jackson River lumber companies together attempted to float 8,000 or 9,000 logs from Back Creek to Covington between 1902 and 1905; and actually succeeded in getting at least 500 logs to Covington. Most importantly, Hot Springs Lumber Company drove 10,000 to 12,000 logs from Back Creek to Kincaid where millions of log feet of timber were sawed. Clearly, a large quantity of timber was floated down the Jackson within a portion of the disputed segment as part of an organized commercial venture. In addition, the hydrological and survey evidence and testimony of witnesses who have boated the Jackson River in canoes prove that it was susceptible for commercial navigation by simpler modes of water transport.[8]

Accordingly, the Corps' determination that the Jackson River Segment is a navigable water of the United States is in accordance with law. Nevertheless, the Corps' determination of navigability is not in accordance with law inasmuch as it subjects the Jackson River Segment to the Corps' regulatory jurisdiction under section 10 of the Rivers and Harbors Act. In *State Water Control Board v. Hoffmann,* 574 F.2d 191 (4th Cir. 1978), Senior Circuit Judge Field, writing for a three-judge panel of the Court of Appeals for the Fourth Circuit,

---

8. Indeed, a folk tale recounts that, long before the Civil War, two Highland County families brought furs down from the upper Jackson to the James River and on to Richmond by a large birch canoe. The furs were traded for salt and horses, which were returned overland to Highland County.

vacated and remanded this court's decision in 427 F.Supp. 589 (W.D.Va.1977) that Smith Mountain Lake, Virginia, was a navigable water of the United States under the Rivers and Harbors Act of 1899 and was not exempt under 33 U.S.C. § 59(*1*) from Corps' regulatory jurisdiction over construction of piers and wharves therein. Although Judge Field sustained this court's finding of navigability based upon historical evidence of interstate commercial use, he concluded that Smith Mountain Lake was exempt from Corps' power to establish permit requirements under 33 U.S.C. § 403, because the exemption from such permit requirements under 33 U.S.C. § 59(*1*) applies by its terms to bodies of water located entirely within one state and considered navigable solely on the basis of historical use in interstate commerce. 574 F.2d 193–194. In light of *Hoffmann,* the court concludes that while the Jackson River Segment is navigable, it is exempt, under 33 U.S.C. § 59(*1*), from Corps' regulatory jurisdiction under 33 U.S.C. § 403, because the Jackson River is located entirely within the State of Virginia and is declared a navigable water of the United States solely on the basis of historical use in interstate commerce.

But while the Jackson River Segment "may [not] be subject to regulation by the Corps of Engineers, acting under the authority delegated it by Congress in [section 10 of] the Rivers and Harbors Appropriation Act, it does not [necessarily] follow that the [river] is also [not] subject to a public right of access." *Kaiser Aetna v. United States,* 444 U.S. 164, 172–173, 100 S.Ct. 383, 388–389, 62 L.Ed.2d 332 (1979). This is because the concept of navigability also "embodies the *navigational servitude,* a modern declaration of the common law right of public access to the surface of water," *United States v. Kaiser Aetna,* 408 F.Supp. 42, 49 (D. Hawaii 1976), *rev'd on other grounds,* 584 F.2d 378 (9th Cir. 1978), *rev'd,* 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979), in addition to being useful for determining the extent of the authority of the Corps under the Rivers and Harbors Act. 444 U.S. at 171, 100 S.Ct. at 388.

The navigational servitude, which exists by virtue of the commerce clause, 444 U.S. at 177, 100 S.Ct. at 391, expresses the notion that the right of the public to use a waterway supercedes any claim of private ownership. *See United States v. Cress,* 243 U.S. 316, 37 S.Ct. 380, 61 L.Ed. 746 (1917); *United States v. Chandler-Dunbar Water Power Co.,* 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063 (1913). It is a dominant federal easement "which attaches to the exercise of the 'power of the government to control and regulate navigable waters in the interest of commerce.'" *United States v. Virginia Electric Power Co.,* 365 U.S. 624, 627–628, 81 S.Ct. 784, 787–788, 5 L.Ed.2d 838 (1961) (quoting *United States v. Commodore Park,* 324 U.S. 386, 390, 65 S.Ct. 803, 805, 89 L.Ed. 1017 (1945)).

Although the power to appropriate without compensation has traditionally been considered incidental to the navigational servitude, *see id.,* because "[t]here is no private property right in the flow of a stream which is subject to the United States navigational servitude," *Conservation Council of North Carolina v. Froehlke,* 435 F.Supp. 775, 787 (M.D.N.C.1977), the "Court has never held that the navigational servitude creates a blanket exception to the Takings Clause...." *Kaiser Aetna,* 444 U.S. at 172, 100 S.Ct. at 388.

Ownership rights of river beds are determined at the date of formation of the Union or at the date of admission to statehood of those states formed later. 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243. And in the absence of a navigational servitude, plaintiffs have the right to control use of the Jackson's waters if they have title to its river bed under Virginia law.

The Jackson River Segment, however, is a navigable water of the United States, and the exercise of federal authority over the river is appropriate because future recreational use by out-of-state visitors of the proposed trout fishery will affect interstate commerce. *See generally, United*

States v. Byrd, 609 F.2d 1204 (7th Cir. 1979). But while the federal navigational servitude would traditionally apply to the river under these circumstances, the court must consider whether the Jackson River Segment is navigable for the purpose of invoking navigational servitude in light of the Court's decision in Kaiser Aetna.

The Supreme Court in Kaiser Aetna held that while Kuapa Pond, (which had been made navigable by private expenditure of millions of dollars), was subject to the Corps' regulatory power, it was not subject to a public right of access unless compensation was paid. Id. 444 U.S. at 180, 100 S.Ct. at 393. Thus, in Kaiser Aetna, navigability for purposes of regulation did not equal navigability for purposes of imposing a navigational servitude.

 The facts in this case, however, are unlike those in Kaiser Aetna. Although the bed of the Jackson River has long been considered by many to be private property under Virginia law and most plaintiffs have paid local property taxes on their portions of the river bed, plaintiffs have not expended millions of dollars in creating navigability in a waterway that was previously nonnavigable. The Jackson River, unlike Kuapa Pond, is historically navigable in its natural state. In addition, the Corps have maintained since the 1960's that the river is navigable and should be open to the public. While plaintiffs may have expected that the Jackson's waters were their property, the defendants have done nothing to bolster those expectations. The court recognizes that the "right to exclude" is a fundamental element of property rights. Nevertheless, because the factual situation in this case is so different from that in Kaiser Aetna, the court holds that a navigation servitude applies to the Jackson River Segment and that the defendants may, without invoking its eminent domain power and paying just compensation, require plaintiffs to allow public access to the surface of the river.

Accordingly, judgment will be entered in favor of defendants, except as to the Corps' assertion of regulatory jurisdiction over the Jackson River Segment pursuant to section 10 of the Rivers and Harbors Act, 33 U.S. § 403. This opinion shall constitute the court's findings of fact and conclusions of law. An appropriate judgment and order will be entered this day.