Robert M. & Bettie H. LOVING; Dewey C. & Mary C. Martin; Paul B. & Gertrude G. Lacy; Ira Francis & Mamie Byer; Cynthia S. Byer; James H. & Virginia F. Burr; Ray E. & Bianco Plasters; Paul L. & Buna H. Pearman; Jack D. & Mary F. Showalter; Lonnie D. & Patricia S. Howard; A.B. & Lucille M. Caul; Ben C. & Norma B. Meeks; Merrill S. & Lois D. Mays; Robert J. & Lillian F. Smith; Eugene C. & Hallie L. Dressler; Donald J. & Cynthia L. Tincher; William T. & Patricia L. Daily; Adelaide D. Bowen; Richard Glen & Susan B. Bailey; William E. & Rosemary C. Driscoll; Leonard E. & Sally A. Nicely, Jr.; Rober B. & Judy D. Evans; Charles D. & Joyce R. Deacon; Homer F. & Faye A. Landis; Grover H. & Virginia K. Byer; Harold B. & Mary T. Dressler; Raymond E. & Betty F. Oyler; Dora McCaleb; James P. & Mary C. Kern; Elsie J. McCormick; Paul B. Lacy, III; Frank G. & Nellie Pearl Gooch; J. Murray & Ellen T. Thompson; Frank E. & Ethel V. Sponaugle, Sr.; Thomas G. & Geraldine W. Botkins, Sr.; Camp Appalachia; Apensui Inc.; and Citizen's United for River & Property Rights, Appellants,

v.

Clifford ALEXANDER, Secretary, Dept. of the Army; Corps of Engineers; Lt. Gen. John W. Morris; Maj. Gen. James A. Johnson; Col. Douglas L. Haller, Appellees.

Virginia Farm Bureau Federation, Amicus Curiae/As.

No. 82–1973.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 5, 1983.

Decided Oct. 4, 1984.

William T. Wilson, Covington, Va. (William T. Wilson & Associates, Covington, Va., on brief); Erwin S. Solomon, Covington, Va. (Erwin S. Solomon & Associates, Covington, Va., on brief), for appellants.

William B. Poff, Roanoke, Va. (William P. Wallace, Jr., Woods, Rogers, Muse, Walker & Thornton, Roanoke, Va., on brief), for amicus curiae.

Jean B. Weld, Asst. U.S. Atty., Roanoke, Va. (John P. Alderman, U.S. Atty., Roanoke, Va., on brief), for appellees.

Before RUSSELL, WIDENER and PHILLIPS, Circuit Judges.

WIDENER, Circuit Judge:

This is an appeal from a decision of the district court, 548 F.Supp. 1079, which sustained a determination of the Army Corps of Engineers (Corps) that the Jackson River from Covington, river mile 23.9, up to the Gathright Dam, river mile 43, is a navigable water of the United States. Because we think correct the conclusion of the district court that, based on historic use, the Jackson River is navigable in fact, we affirm.

In 1946, Congress authorized the construction of the Gathright Dam on the Jackson River in Allegheny County, Virginia for purposes of flood control, water quality control, and navigation.[1] The Corps, which had recommended the project, proceeded with planning. Land acquisition was begun in 1967, construction in 1968. Much of the land acquired for the dam was previously a state-managed wildlife area, which included a trout fishery in waters upstream of the projected dam site. The dam created a lake (Lake Moomaw), which of course inundated the area upstream. Pursuant to the Corps' authority to provide for optimum public use and benefits from its projects, a plan was worked out in consultation with the Virginia Commission of Game and Inland Fisheries (Commission) to establish a new coldwater fishery below the dam. The status of the fishery, however, may be subject to some dispute.

The Corps thereupon commissioned a navigability study by John W. Knapp of VMI Research Laboratories, who submitted a report which found the Jackson River navigable up to its confluence with Back Creek at river mile (hereinafter RM) 55. On February 23, 1978, based on Knapp's report, the Corps issued a formal determination of navigability pursuant to 33 C.F.R. § 329. In furtherance of the projected fishery, the Corps purchased the fee simple interest in several plots of land along the river to provide public access and parking for the projected fishery.[2]

In October 1979, Robert M. and Betty H. Loving, et al, riparian landowners on the Jackson, filed suit challenging the Corps' determination of navigability as it applied to the Jackson River between the Gathright Dam (RM 43) and the confluence with Dunlaps' Creek in Covington, VA (RM 23.-9). This 19.1 mile portion of the river was referred to as the Jackson River Segment in the district court. The plaintiffs also sought to enjoin the plans for public access for recreational use and to prevent a taking of their property without compensation in violation of the Fifth Amendment to the Constitution. Amicus briefs were filed on both sides.

The district court held the Jackson River Segment was a navigable water of the United States, denied the requested injunction, and rejected the Lovings' claims under the Fifth Amendment that their property had been taken without compensation.

The Corps introduced in evidence trial transcripts of three Virginia state court cases, nearly all the witnesses in which are now unavailable, which dealt with the navigable characteristics of the Jackson River. These were *Hot Springs Lumber and Manufacturing Co. v. Revercomb*, 106 Va.

---

1. P.L. 79–526, Flood Control Act of 1946 § 10.

2. One site is within the lands acquired for the dam project, while five others were purchased individually at approximately RM 40, 39.5, 35.5, 33.5, and 30.

176, 55 S.E. 580 (1906) (*Revercomb #1*); *Hot Springs Lumber and Manufacturing Co. v. Revercomb,* 110 Va. 240, 65 S.E. 557 (1909) *(Revercomb #2) (both jury trials); and Boerner v. McCallister,* 197 Va. 169, 89 S.E.2d 23 (1954). The *Revercomb* cases were suits by a landowner, Revercomb, against the Hot Springs Lumber and Manufacturing Co. (Hot Springs) for damage done to the banks of the river on his land (at RM 50) by the company's log drives. Severe and progressive losses of land were alleged due to gaps torn in a previously well-retained bank. In the first case the jury awarded Revercomb damages, but the Virginia Court reversed and dismissed without prejudice for failure to properly address the question of the "floatability" of the Jackson River. The question in that case was not whether or not the Jackson was navigable at all, but whether its times of water high enough to be useful occurred periodically and with reasonable certainty. 55 S.E. at 584. In the second case, Revercomb modified his pleadings and the jury found the river was not "floatable" and again awarded damages. 65 S.E. 557. *Boerner v. McCallister* was a suit based on allegations of trespass against a fisherman in the river at McCallister's property, located at RM 40–41, just above Natural Well, within the Jackson River Segment. After a bench trial, the trial court found the Jackson River was not navigable and thus was private property for which a cause for a continuing trespass could be maintained. 89 S.E.2d 23. Both *Revercomb #2* and *Boerner* were affirmed by the Virginia Court.[3]

▮ Navigability is a term that has traditionally been defined by decisions of the federal courts. This rule can be traced back to *The Daniel Ball,* 77 U.S. (10 Wall.) 557, 19 L.Ed. 999 (1871), in which the Supreme Court held that navigable in law means navigable in fact. Rivers are navigable "when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water." *Id.* at 563. The extent and manner of use of a navigable river is not important as long as it is usable as an actual avenue of commerce. E.g. *United States v. Utah,* 283 U.S. 64, 83, 51 S.Ct. 438, 443, 75 L.Ed. 844 (1931).

The rule of navigable in fact, though unchanged, has been refined over the years. In *United States v. Appalachian Electric Power Co.,* 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 (1940), the Supreme Court described three ways that navigability may be established: 1) present use or suitability for use, 2) suitability for future use with reasonable improvements, or 3) past use or suitability for past use. The third type of navigability is the one that concerns us here. The Corps' determination was made based on historic usage.

▮ Recent disuse due to the development of alternative modes of transport or artificial obstructions will not alter a watercourse's historical navigable status. "When once found to be navigable, a waterway remains so." *Appalachian Electric,* 311 U.S. at 408, 61 S.Ct. at 299. This rule recognizes the reality that many streams which may have supported considerable commerce in their day are now superseded by the trucks and railroads of the modern era. Navigability in fact is not diminished and the power which may be exerted under the commerce clause is not relinquished when a better means of transport is developed.

---

**3.** We do not imply that we have given no weight to the Virginia decisions concerning the navigability of the Jackson river. Cf. *United States v. Rio Grande Dam & I. Co.,* 174 U.S. 690, 19 S.Ct. 770, 43 L.Ed. 1136 (1899). The United States, however, was not a party to the Virginia cases and res judicata would not apply for that reason. *Economy Light & Power Co. v. United States,* 256 U.S. 113, 123, 41 S.Ct. 409, 412, 65 L.Ed. 847 (1921). Additionally, the Virginia court in *Boerner* did not take into account the records in the *Revercomb* cases, and *Revercomb #2,* of course, did not take into account the *Boerner* record. There is also evidence in the case at hand in addition to that contained in the records of the Virginia cases. *Economy Light & Power Co.,* at p. 123, 41 S.Ct. at p. 412.

Navigability is also not destroyed because a watercourse is interrupted by occasional natural obstructions or portages, nor need navigation be open at all seasons of the year, or at all stages of the water. *Economy Light & Power v. United States*, 256 U.S. 113, 41 S.Ct. 409, 65 L.Ed. 847 (1921). However, susceptibility of use as a highway for commerce should not be confined to exceptional conditions or short periods of temporary high water. *United States v. Utah*, 283 U.S. 64, 51 S.Ct. 438, 75 L.Ed. 844 (1931). The condition of the watercourse should be such as to ordinarily assure regularity and predictability of usage. See *United States v. Rio Grande Dam and Irrigation Co.*, 174 U.S. 690, 19 S.Ct. 770, 43 L.Ed. 1136 (1899).

Navigability is basically a question of fact determined from the particular circumstances of each case, *United States v. Utah*, 283 U.S. at 87, 51 S.Ct. at 445, but these are questions of law inseparable from the particular facts to which they are applied. *Appalachian Electric*, 311 U.S. at 404, 61 S.Ct. at 297. The test of navigability requires a finding of navigability from evidence of anything from "the carriage of ocean liners to the floating out of logs." *Appalachian Electric*, 311 U.S. at 405, 61 S.Ct. at 298. Our sole concern is whether, in its natural state, the Jackson River Segment is or was capable of carrying commerce.

The district court found, based largely upon the records of the three state cases introduced by the government, that the Jackson River Segment met the third of the *Appalachian Electric* criteria; that the segment had been used for useful commerce in the past.

It is undisputed that a tradition of navigation up the Jackson to Dunlap's Creek in Covington (RM 23.9) goes back to the colonial era, and included regular transport of people and goods by bateaux. This use as an artery of commerce subsided with the development of the railroad. Thus, the navigability of the lower Jackson below RM 23.9 has not been challenged.

The *Revercomb #2* and *Boerner* transcripts reveal numerous uncontradicted instances of the use of the upper Jackson to float articles of commerce along various stretches during the late 1800's-early 1900's. Although the plaintiffs argue that the successful log drives by the Hot Springs Lumber and Manufacturing Co. in the upper Jackson (above RM 42), detailed in *Revercomb #2*, should not be read to imply navigability of the Jackson River Segment we are here concerned with, the fact remains that the drives, which began at various points upriver of the current dam site, and which were successful, were made to the Hot Springs Mill at Cedar Creek (near Kincaid), at RM 42, or along 1 mile of the very segment the plaintiffs claim is not navigable. Hot Springs' drives continued from 1904 to 1907, when they were stopped by their loss in *Revercomb #2*.

The district court found 10–12,000 logs were driven to Kincaid in this period. The evidence in the *Revercomb #2* case also indicates that on at least one occasion (probably in 1905) Hot Springs ran a "rear drive" [4] from Kincaid (RM 43) to Dry Run (RM 26). On another occasion, when the Kincaid boom was full and a rise in the water level sent down logs that had been held upstream awaiting room in the boom, the logs were driven to Covington (RM 23) from above Kincaid Gorge (RM 44–45), a total of 600–700,000 board feet.

Considerable evidence was presented in *Revercomb #2* by experienced log drivers that the Jackson was a good floatable river, capable of carrying logs on its regular rises due to rains and thaws.

In addition to the activities of Hot Springs above RM 42, other witnesses detailed numerous instances of drives of railroad ties and other goods to Covington. For instance, E.N. Williams was personally

---

**4.** A drive after the main drive which cleans up logs driven up onto the banks or hung up on islands.

aware of several drives of railroad ties from Kincaid Gorge to Covington, the length of the disputed segment of the river. In 1884, he helped a Mr. Keiser float ties from Natural Well/Oliver's Cut (RM 40) to Covington. Subsequently, Henry Noel drove some ties through the Gorge (RM 44) down to Covington, and Williams knew of two gentlemen who floated ties from Hughes Draft or Big Lick (above the Gorge) to Covington in about 1887. Williams also saw Sag Johnson float some sawed timber in the Jackson River Segment, which was confirmed by J.C. Critzer. John Fry confirmed the drive by Henry Noel and added his recollection of a drive by John Day in which 3000 ties were driven from Natural Well (RM 40) to Covington.[5]

Before the Hot Springs' undertaking at Kincaid some effort was made to drive logs from Back Creek (RM 55) to Covington, first by Sipes & Alexander and then by its successor, the Jackson River Lumber Co. Counsel for the Corps has acknowledged that these attempts were largely unsuccessful, and of course the plaintiffs argue that the failure of these ventures show the segment was not navigable. Were the Sipes & Alexander efforts all the evidence, perhaps the argument could stand, but there is too much uncontradicted evidence of ordinary commercial use of the river to base a decision on that evidence. The failure of the big drives also did not take into account testimony of numerous smaller drives from about RM 39 down to the Sipes and Alexander mill (RM 26) which continued for several years.

In *Boerner*, a further instance of use of the Jackson River Segment for commerce was reported by J.B. Bodkins, who testified that he was hired by R.M. Johnson to help drive some logs from Cedar Creek (RM 42) to Dry Run (RM 26) in 1902.

Log driving on the lower portion of the Jackson essentially ceased when Hot Springs brought a railroad spur into Kincaid (at Cedar Creek, RM 42), which obviated the need to drive all the way to Covington. This introduction of an alternative to river transport did not make the river suddenly less navigable, just less efficient than other modes of commerce. The growth of interstate commerce by rail does not detract from the historic commercial usefulness of the Jackson River with its linkage to the James River and the Atlantic Ocean.

A final most relevant item of evidence is a legislative acknowledgment of the existence of navigation within the Jackson River Segment in the 1800's. In 1823, the Virginia General Assembly enacted legislation authorizing Bernard Pitzer to continue or construct a dam across the Jackson. The dam was to be located at approximately RM 26, above the mouth of Dunlap's Creek and the location of Covington at the time. The Act required that the dam have "a good and sufficient lock for passage of boats [and]...keep the same in such repair as not to obstruct the navigation of said river..." The Act further provided for abatement of the dam as a nuisance by the county court should the lock prove insufficient.[6] The necessary inference is a legislative recognition of boat traffic above RM 26.

Plaintiffs argue that Hot Springs' activities between RM 42 and 43, as well as the admittedly navigable river below RM 23.9 should be divorced from the navigability of the balance of the Jackson River Segment under *Minnehaha Creek Watershed Dist. v. Hoffman*, 597 F.2d 617 (8th Cir.1979), and *Sierra Pacific Power Co. v. FERC*,

---

**5.** Williams, in reference to Henry Noel's drive, and Fry, in reference to John Day's drive, both admitted they hadn't witnessed the actual arrival of the ties in Covington, but noted that at the time there was no other place to go, as Covington had the railroad.

**6.** Acts of Assembly, ch. 43, passed Dec. 31, 1823. The legislature made similar provision for the passage of boats in Acts authorizing the construction of a dipping wheel (1834) and a wool carding machine (1837) on the river. These were located within and opposite to the Town of Covington and thus did not directly implicate the Jackson River Segment. Although locks were not required, each Act provided for a $20 fine for each delay or obstruction of boat passage and liability for damages from such delay or obstruction. At the least the Acts of 1834 and 1839 are legislative recognition of then present boat traffic in Covington.

681 F.2d 1134 (9th Cir.1982). In these cases, rivers with admittedly navigable sections were held not navigable under the federal definition because the crucial interstate sections were not navigable, cutting off upstream navigability although upstream sections had been used for commerce. *Minnehaha* at 623; *Sierra Pacific* at 1138, 1139. We find more than sufficient evidence, however, of activity on the Jackson River Segment to render these cases inapplicable. Both *Minnehaha* and *Sierra Pacific* contained extensive affirmative evidence of nonnavigability, and noted the conspicuous absence of evidence of successful use of the river sections in question. The Jackson River Segment does not suffer from such insufficiency of evidence.

■■■ In sum, the evidence showed that the drives of lumber in its various forms, such as logs and railroad ties, although they did not extend over a long period of time, were not exceptional one-time occurrences of the sort rejected as a basis of navigability in *United States v. Rio Grande Dam and Irrigation Co.*, 174 U.S. 690, 19 S.Ct. 770, 43 L.Ed. 1136 (1899). The district court found, and we agree, that they were regular, not occasional, drives whenever the water level rose 18 inches or more, which happened in a somewhat predictable fashion several times each year. *Economy Light & Power* 256 U.S. at 122, 41 S.Ct. at 412. The log driving started late and soon ended, but, despite subsequently changed conditions, it is the capability for use, not the actual extent and manner, that is determinative. "Navigability will not be denied because exploration made recourse to navigation on this river a late adventure..." *United States v. Utah*, 283 U.S. at 83, 51 S.Ct. at 443. Although the development of the railroad drew commerce away from the river and litigation and injunctions may have discouraged business, commercial use was made of the log-floating capacity of the river in the late 1800's and early 1900's. These drives dem-

onstrated that the stream was indeed useful as a means of commercial transportation. *The Daniel Ball*, supra.

■■■ There is no basis for rejecting the district court's conclusion that under the *Appalachian Electric* analysis the Jackson River, from RM 43 to 23.9, meets the federal test of navigability. The Corps' declaration that the portion of the river, RM 23.9 up to the Gathright Dam, is navigable, is affirmed.[7] The navigational servitude has existed since the ratification of the Constitution, so nothing has been taken from the property owners subject to it by the declaration of the Corps of its existence. Thus, the plaintiffs are not entitled to compensation merely on that account. See *Kaiser Aetna v. United States*, 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332 (1979).

■■■ Because of the claim of the plaintiffs that the government, without compensation, is turning their properties into a public fishing ground, we take notice that attendant open gates, broken fences, stray livestock, beer cans, trash, garbage, forest fires, and stray bullets are only a few of the not minor damages and inconveniences to which they doubtless would be put. For that reason, it is just as important in this decision to say what we do not decide as what we do.

■■■ The bed and banks of the Jackson River in question are not a public fishing ground at present, and the Corps of Engineers has not made them one. The decision of the district court which we affirm did nothing more than hold that "a navigable servitude applies to the Jackson River segment," and that the defendants may "require plaintiffs to allow public access to the *surface of the river*." (Italics added). The government has purchased certain properties along the stretch of river in question. It is a riparian landowner and has the right to allow the public to use its said lands as does any other property owner on the river, public or private. Just as

---

7. We express no opinion on the portions of the river above RM 43, now under Lake Moomaw and beyond, which the Corps also declared navi-

gable, which finding was not attacked in these proceedings.

the plaintiffs may permit fishing on their properties, so may the government on the lands it has acquired; and just as the plaintiffs may permit boats to enter the river from their properties, so may the government. Boats may use the surface of the entire disputed segment of the river. This does not require private property owners to permit access to the river through or from their properties. "The technical title to the beds of the navigable rivers of the United States is either in the states in which the rivers are situated, or in the owners of the land bordering upon such rivers. Whether in one or the other is a question of local law." *United States v. Chandler-Dunbar W.P. Co.,* 229 U.S. 53 at p. 60, 33 S.Ct. 667 at p. 671, 57 L.Ed. 1063 at p. 1074 (1913); see *Appalachian Electric,* 311 U.S. at 428, 61 S.Ct. at 309. The district court in its decision properly denied the right of the Corps of Engineers to regulate the use of the river under 33 U.S.C. § 403 because of the exemption from such permit requirements under 33 U.S.C. § 59 *1. State Water Control Board v. Hoffmann,* 574 F.2d 191 (4th Cir.1978). The Supreme Court of Virginia in the case of *Boerner v. McCallister,* 197 Va. 169, 89 S.E.2d 23 (1955), has pointed out the difference in the use of beds of streams where the land in question is derived by grants from the Crown or the Commonwealth prior and subsequent to 1802. 89 S.E.2d at p. 26–27. That decision also points out, but does not decide, that, at least in 1955, it was at the best an undecided question whether or not the public interest in a navigable stream, the bed of which is privately owned, extends any further than "the right of navigation." 89 S.E.2d at 27. Thus, according to our decision, while the surface of the disputed section of the Jackson River may be used by the public, the use of its bed and its banks are matters of state law, subject only, so far as the United States is concerned here, to the navigational servitude and whatever regulation Congress may lawfully impose.

The judgment of the district court is accordingly

AFFIRMED.